IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Michael Chicca | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:10-cv-02990 |
| | § | |
| St. Luke's Episcopal Health System | § | |
| | § | |
| | § | |
| Defendant | § | JURY TRIAL DEMANDED |
| | § | |

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Michael Chicca asks the Court to grant summary judgment on Defendant's affirmative defense of exemption from the Fair Labor Standards Act. In support of this motion, Mr. Chicca shows the following.

## I. INTRODUCTION

Michael Chicca sued his former employer, St. Luke's Episcopal Health System ("Defendant" or "SLEH"), for failure to pay for overtime hours of work in violation of the Fair Labor Standards Act ("FLSA"). SLEH pled it its answer that Mr. Chicca was exempt from the overtime provisions of the FLSA. (Dkt. No. 4, *Sixth Affirmative Defense*). SLEH asserted the "computer professional" and administrative exemptions in discovery. Exh. A, *Def. Interrog. Ans.*, p.10. Since SLEH has not identified any other exemptions, either in its answer or in response to discovery, this motion is limited to the computer professional and administrative exemptions.

As will be shown below, the computer professional exemption only applies to employees whose primary duties relate to the development of new or improved computers, programs, or

1

systems. By contrast, Mr. Chicca's primary duties were limited to entering and updating the user profiles, security classifications, and security access codes for employees of Defendant, into the computer programs that the employees used. Exh. C, *Chicca Decl.*, ¶¶12 & 17. Mr. Chicca's involvement in the installation of new programs was limited to (1) entering or updating the user profiles and access codes for employees after a new program or upgrade was installed, and (2) taking notes at meetings with the members of other departments, who worked on installing new or upgraded programs. *Id*.

However, since SLEH used computers and programs created by outside vendors, without modifying the computers' or programs' essential characteristics, none of the computer technical support employees at SLEH participated in the development of new or improved computers, programs, or systems. Exh. C, *Chicca Decl.*, ¶22. Michael Chicca did not write new programs, design new hardware, or re-arrange the configuration of computers for Defendant. *Id*. SLEH's department managers decided what level of security access the employees would have; Mr. Chicca's role in creating the user profiles, security groups, and access codes was essentially data entry. *Id.* Mr. Chicca therefore fails to qualify for the computer professional exemption in the Fair Labor Standards Act.

The administrative exemption applies to employees who have a significant level of discretion over the operations of the employer. Mr. Chicca's hardly had any discretion over his own job duties, and certainly had no discretion over the manner in which other employees carried out their work. Exh. C, *Chicca Decl.*, ¶21. Mr. Chicca therefore lacked the "discretion and independent judgment with respect to matters of significance" required for application of the administrative exemption. 29 C.F.R. 541.200(a)(3). For these reasons, as further explained below, Plaintiff asks the Court to find, as a matter of law, that Plaintiff was not exempt from the

overtime provisions of the Fair Labor Standards Act.

## II. STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only "if ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is material if it could affect the outcome of the lawsuit, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Houston Police Officers Union v. City of Houston*, 330 F.3d 298, 301 (5th Cir. 2003).

Exemption from the FLSA is an affirmative defense, and exemptions are construed narrowly against the employer. *Barefoot v. Mid-America Dairymen*, 16 F.3d 1216, 1994 WL 57686 at *2; *Smith v. City of Jackson, Miss.*, 954 F.2d 296, 298 (5th Cir. 1992); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966); *Marshall v. Sundial Associates*, 588 F.2d 120, 122 (5th Cir. 1979); *Brennan v. Texas City Dike & Marina, Inc.*, 492 F.2d 1115, 1117 (5th Cir. 1974). This means that any ambiguity in the exemption statute should be resolved in favor of the employee and in favor of non-exempt status. However, Defendant cannot show that either of the exemptions it asserts can apply to an employee with the duties of Michael Chicca.

## III. ARGUMENTS AND AUTHORITIES

**A. Michael Chicca's Job Duties Do Not Qualify for the Computer Professional Exemption in the FLSA.**

　　1. <u>The Computer Professional Exemption Applies to Persons Who Create New or Improved Computers, Programs, or Systems.</u>

The FLSA requires employers to pay employees for their hours of work in excess of forty (40) in a week at one and a half times the employee's regular rate of pay. 29 U.S.C. §207(a). An

employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, is exempt from overtime if the primary duty of such employee is:

- **(a)** the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

- **(b)** the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

- **(c)** the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

- **(d)** a combination of duties described in subparagraphs (a), (b), and (c) the performance of which requires the same level of skills. 29 U.S.C. 213(a)(17).

Some prior cases have helped make the meaning of these broad, vague words a little clearer. In *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 579-581 (6th Cir. 2004), the Sixth Circuit held that a FLSA plaintiff was not a computer professional because his duties only involved installing and troubleshooting existing hardware and software. *Id*.

By contrast, the Eleventh Circuit held that a plaintiff was exempt under the computer professional exemption, where Plaintiff created new programs to fit the business plan of the customer. *Bergquist v. Fidelity Information Services, Inc.*, 399 F.Supp.2d 1320, 1331-1332, (M.D.Fla. 2005).

What distinguishes these two cases is that in *Martin* the non-exempt plaintiff was responsible for implementing and maintaining *existing technology*. *Martin*, at 579-581. His job was simply to make the equipment perform as expected. *Id*. By contrast, the exempt plaintiff in *Bergquist* played a role in creating *new or improved technology*. *Bergquist*, at 1331-1332. Bergquist helped decide how a new version or upgrade to the equipment *should* function, and planned new designs or features that did not exist before. *Id*.

This bright line test, drawn from the cases, helps make sense of the language in the statute. Using "systems analysis techniques . . . to determine hardware, software or system functional specifications" – indicates that the exempt employee *decides what features* the computer technology will have. 29 U.S.C. 213(a)(17)(A). Making a computer or server perform according to existing specifications is technical support; deciding how the equipment should perform under new specifications is research and development. Thus, it is plain that the computer employee exemption was intended to apply to hardware and software designers – not those who repair and troubleshoot devices with a pre-existing design.

Working on "the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs" – bears out a similar interpretation. 29 U.S.C. 213(a)(17)(B). Words like design, development, and creation suggest by their ordinary meanings that they contemplate more than maintaining or restoring existing technology. Although documentation and analysis are broad words, they must be read in context of the overall statute and the holding of cases like *Martin*. The "documentation" and "analysis" contemplated is that which is a necessary companion of design, development, and creation – whether it is documenting the results of a prototype test, or analyzing the reasons that a prior design failed.

Defendant may not argue that repairing or troubleshooting computers constitutes "modifying" them for purposes of the exemption, because the non-exempt plaintiff in *Martin*, above, repaired computers as part of his duties. *Martin*, at 579-581. It follows that the type of modification contemplated by the exemption is that which is involved in the creation of new or improved hardware or software. *Id*.

      2.   <u>The Department of Labor Has Clarified the Meaning of the Computer Professional Exemption</u>.

Section 213(a)(17)'s use of broad words and phrases like "analysis" and "consulting with users" may tempt to SLEH to argue that any form of problem solving, thinking, or discussion of computers with a computer user would qualify.  However, a 2006 Opinion Letter from the Department of Labor makes clear that not all forms of "analysis" that relate to computers will qualify for the exemption.  *See the Department of Labor's Opinion, FLSA2006-42,* 2006 WL 3406603, attached as Exhibit B, pp1-6.

Specifically, the DOL found that employees with the following duties were not covered by the exemptions for computer professional or administrative exemption:

    (1)   "analyzes, troubleshoots, and resolves complex problems with business applications, networking, and hardware";
    (2)   "accurately documents all work in appropriate problem tracking software";
    (3)   "prioritizes tasks based on service level agreement criteria with limited supervision";
    (4)   "installs, configures, and tests upgraded and new business computers and applications based upon user-defined requirements";
    (5)   "assists users in identifying hardware/software needs and provides advice regarding current options, policies, and procedures";
    (6)   "creates and troubleshoots network accounts and other business applications user accounts as documented in the employee lifecycle process";
    (7)   "participates in the design, testing, and deployment of client configurations throughout the organization";
    (8)   "participates in the analysis and selection of new technology required for expanding computer needs throughout the organization";
    (9)   "documents technical processes and troubleshooting guidelines";
   (10)  "monitors automated alerts generated by systems management tools and makes decisions on the most effective resolution."  Exhibit B, pp.1-2.

The DOL found that such an employee does not exercise the "discretion and independent judgment" required for the administrative exemption.  *Id* at pp.4-5.  The DOL found that such an employee also does not satisfy any of the alternative tests for

the computer employee exemption. *Id* at pp.6-7.

Taken together, the terms of the computer professional exemption statute foregoing authorities show that the type of "analysis" "testing" and "documentation" required by the statute is that which is involved in the creation of new or improved technology. If mere computer troubleshooting, or the installation of finished software could make an employee exempt, then the DOL would have granted exempt status to the employees described above.

> 3. The Computer Professional Exemption Does Not Apply to Michael Chicca, Because His Primary Duties Were Data Entry and Writing Down the Minutes of Meetings.

SLEH uses many different computer programs in its hospital, for business management, human resources, accounting, payroll, patient medical records, the pharmacy, and other services related to patient care. Exh. C, *Chicca Decl*., ¶3. All or nearly all of these programs have security access limitations such as passwords. *Id.* SLEH's employees only have access to the programs that they need to use for their respective jobs, and as a result, an employee who changes departments must often request access to the new programs that she or he will now use. *Id.* New employees must have their identifying information entered into the computer programs that they will use, and departing employees must have their access revoked. *Id.*

SLEH's computer technical support division has various subgroups that specialize in different aspects of the hospital's computer system. Exh. C, *Chicca Decl*., ¶4. SLEH's Information Protection Department is a subgroup of SLEH's computer technical support division that maintains computer program access for SLEH's employees. *Id.* Mr. Chicca worked for SLEH's Information Protection Department, and therefore Mr. Chicca worked primarily on matters relating to program access and security. *Id.* Mr. Chicca did not handle troubleshooting

and maintenance requests that were unrelated to program access or security, because these requests were handled by other computer support departments. *Id;*

SLEH managed its employees' requests for changes to computer access privileges through the Access Control Entitlement System (ACES). Exh. C, *Chicca Decl.*, ¶5. Whenever SLEH hired a new employee, lost an employee through termination or resignation, promoted an employee, or moved an employee from one department to another, a request was usually submitted through ACES for a change in the employee's computer access profile. *Id.* Completing an ACES request could involve the creation of a new user profile in a new program, the creation of a new access password, or a change in the security group (meaning the security level) which the employee occupied in an existing program. *Id.* If SLEH installed a new version of an existing program (an upgrade), this often required the user profiles, security groups, and passwords for employees to be imported or re-established for all users of the program. *Id*.

However, Michael Chicca did not decide what level of security access any employee would have. Exh. E, *Brown Depo.*, pp.16-17; Exh. C, *Chicca Decl.*, ¶15. Thus, Mr. Chicca's role in granting or refusing security access, was limited to entering the security profiles, security levels, and passwords that Defendant's managers had approved, into the computer system. Exh. D, *Morton Depo.*, pp.7, 8-9, & 18-19.

Mr. Chicca estimates that he spent about six hours a day (on the average) handling requests for changes to the employees' computer security access in ACES. Exh. C, *Chicca Decl.*, ¶7. This is consistent with Defendant's own estimates. Exh. D, *Morton Depo.*, p.78.

If an employee encountered an unexpected problem with computer security access, such as the failure of the computer to recognize an existing password, the employee submitted a request (called a ticket) in the Remedy system. Exh. C, *Chicca Decl.*, ¶7. Unlike ACES,

Remedy was used to request help on issues that could not be anticipated as readily as a program upgrade, and more often required immediate or emergency attention. *Id*. While Remedy tickets were also used to request help from unrelated computer support departments, Mr. Chicca had his share of Remedy tickets that specifically required action from the Information Protection Department. *Id*.

Mr. Chicca's time spent on Remedy tickets varied from one week to another, because Mr. Chicca rotated responsibility for Remedy tickets with other Information Protection Department employees. Exh. C, *Chicca Decl*., ¶8. Nevertheless, Mr. Chicca estimates that on average he spent around one and a half (1.5) hours a day dealing with Remedy Tickets. *Id.* This is also consistent with Defendant's own estimates. Exh. D, *Morton Depo*., p.78.

SLEH periodically installed new versions of software, which were created and sold by the same vendors who provided the original software. Exh. C, *Chicca Decl*., ¶9. However, Mr. Chicca did not make, select, or install the upgrades himself. *Id*. Instead, Mr. Chicca simply re-entered or imported the security access information after the new version of the program was installed. *Id.*

In fact, Defendant's entire process of installing upgrades, which were created and directed by outside vendors, would not make any of the employees involved in the upgrades exempt under the computer professional exemption. Defendant upgraded programs by purchasing a new version of a program and following the vendor's recommended steps for installation. Exh. C, *Chicca Decl*., ¶10. Upgrades did not involve modifying the program to have features or abilities beyond those already provided by the vendor. *Id.* Installing a new program sometimes involved adjusting the settings of a program, to change the visual display or to turn certain available features on or off. *Id.* However, this is merely part of using the program

and should not to be confused with "modifying" the program in the manner contemplated by the exemption in 213(a)(17). *Id*; see Exh. D, *Morton Depo*., p.151 (confirming that Chicca did not do computer programming); p.161 (testifying that the upgrades to security features were included in the software made by outside vendors, and these vendors, not Michael Chicca, changed the security features).

Installing an upgraded version of a program involved the participation of several different computer technical support departments. Exh. C, *Chicca Decl*., ¶11. As a result, the computer technical support division held daily "change management" meetings to discuss the status of plans to replace computer programs or computer hardware. *Id.* Although Mr. Chicca nominally chaired these meetings, this gave Mr. Chicca no authority to direct any other department or employee. *Id*. Mr. Chicca's supervisor testified that Chicca's role during the meetings was limited to advancing the slides on the presentation and taking notes of the discussion; Chicca did not have authority to set the agenda for the meetings or to set the schedule for the upgrades. Exh. D, *Morton Depo*., pp.69-71.

Mr. Chicca's role in these meetings was to write down the content of the discussion and prepare a set of written minutes, which Mr. Chicca later circulated by e-mail to the managers of the various computer support departments. Exh. C, *Chicca Decl*., ¶11. Mr. Chicca estimates that attending these meetings, and making the minutes, consumed approximately one hour a day. *Id*. This, once again, is consistent with Defendant's estimates. Exh. D, *Morton Depo*., p.73 (change management meetings held daily); p.92 (change management meetings plus the circulation of minutes took about an hour).

Mr. Chicca's own personal role in the upgrades, beyond attending these meetings and making the minutes, was limited to entering or adjusting the employees' user profiles, security

groups, and passwords. Exh. C, *Chicca Decl*., ¶12. Since upgrades typically involved some adjustment to the security access information (if only to repeat what was done on a previous version of the program), Mr. Chicca was involved so that security access after an upgrade could be as effective as it was before the upgrade. *Id*. Mr. Chicca did not even install the new software himself; this was usually the responsibility of the Implentation Technology Department, working in cooperation with the clinical or business department being supported. *Id*; See also Exh. D, *Morton Depo*., p.161 (confirming that Chicca did not install the programs on the computer himself).

Mr. Chicca did communicate with the departments that owned (i.e., used) the programs that Chicca supported. Exh. C, *Chicca Decl*., ¶13. However, Mr. Chicca communicated with these departments for the limited purposes set forth above; Mr. Chicca did not consult with these departments to determine their hardware or software needs, and then design a new or improved system to match those needs. *Id.* Mr. Chicca therefore did not apply "systems analysis techniques and procedures, including consulting with users, *to determine hardware, software, or system functional specifications*" within the meaning of the computer professional exemption statute, 29 U.S.C. 213(a)(17)(a).

After an upgrade, Mr. Chicca usually sat next a member of the department using the program, while the user tested the computer security access for various employees in the department. Exh. C, *Chicca Decl*., ¶14. The point of this test was to determine whether each employee could open the program and use the features that should be available to that employee, while at the same time ensuring that certain sensitive or restricted functions and information would be available only to those who were authorized to have them. *Id*. Not all employees had the same level of access, and some features or types of information in a program would not be

available to some employees. *Id.*

This "testing" of the security features in a program allowed the user's department to verify that all employees had the right level of computer access privileges. Exh. C, *Chicca Decl.*, ¶15. Although SLEH may describe this review process as "testing a new system" it was not the testing of a system created by Mr. Chicca, and Mr. Chicca did not decide what level of security access an employee should have. *Id*; Exh. E, *Brown Depo.*, p.16. The level of access was dictated by the employee's job description, and the department manager's directions to Mr. Chicca. Exh. C, *Chicca Decl.*, ¶15. Thus, this kind of testing is not the "testing . . . of computer systems or programs, including prototypes, based on a related to user or system design specifications" contemplated by part (b) of the computer professional exemption statute, 29 U.S.C. 213(a)(17)(b).

Mr. Chicca entered notes into the ACES and Remedy systems to document the completion of a request or ticket. Exh. C, *Chicca Decl.*, ¶16. However, this merely documented the completion of such tasks as the creation of a new user profile and password. *Id.* These ACES and Remedy entries may be "documentation" in SLEH's vocabulary, but this is not the "documentation . . . of computer systems or programs, including prototypes, based on and related to user or system design specifications" contemplated by part (b) of the computer professional exemption statute, 29 U.S.C. 213(a)(17)(b).

The Court can easily dispose of Part (c) of the test for the computer professional exemption. 29 U.S.C. 213(a)(17)(c). There is no evidence that SLEH even possessed machine operating systems, and no evidence that Chicca ever encountered something matching this description in his work. In any event, nothing that Mr. Chicca did reached the level of "design, documentation, testing, creation, or modification" within the meaning of 29 U.S.C.

213(a)(17)(c).

Mr. Chicca's job description and performance reviews dress up his duties in vocabulary that resembles the words in the computer professional exemption statute. However, after examining Mr. Chicca's actual duties, it becomes clear that the phrases in the job description and performance reviews did not mean, in the case of Mr. Chicca, anything like what was contemplated in the professional exemption statute. See e.g., Exh. D, *Morton Depo*., pp.61-65 (reviewing Chicca's entries in the ticket logs and confirming that Chicca's daily assignments were creating or updating user identification names and passwords).

To interpret 29 U.S.C. 213(a)(17) in such a way as to apply it to Chicca would require removing certain words like "analysis" "testing" "documentation" and "modification" from their statutory context, ignoring key phrases throughout, and assuming (without authority) that the selected words mean whatever SLEH used these words to mean in its own operations. This manner of interpretation will not do, since FLSA exemptions are narrowly construed against the employer. *Barefoot* at *2; *Smith v. City of Jackson, Miss.*, at 298; *Idaho Sheet Metal Works,* at 206 (1966); *Marshall v. Sundial* at 122; *Brennan v. Texas City Dike & Marina,* at 1117.

Any assessment of the exemption must go beyond the conclusory labels given by SLEH to Mr. Chicca's duties, to reach a specific description of assignments or projects completed by Mr. Chicca, and the steps involved. As demonstrated above, when Mr. Chicca's duties are stripped of industrial jargon and reduced to a series of steps described in plain terms, it becomes clear that Mr. Chicca cannot be subject to the computer professional exemption. The computer professional exemption of 29 U.S.C. 213(a)(17) covers employees whose work relates to the development of new or improved computers, programs, and systems, and does not apply to an employee like Michael Chicca, whose work involved, at most, supporting the users of existing

computers, programs, and systems.

### B. Michael Chicca's Job Duties Do Not Qualify for the Administrative Exemption in the FLSA.

Defendant will also be unable to meet its burden of proof to apply the administrative exemption to Plaintiff. An employee is exempt from overtime under the administrative exemption if the employee is compensated on a salary or fee basis and the employee's primary duty is the performance of office or non-manual work that:

(a) "is directly related to the management or general business operations of the employer or the employer's customers" and

(b) "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. 541.200(a).

1. <u>The Department of Labor Has Rejected the Administrative Exemption for Computer Technical Support Employees.</u>

In a 2006 Opinion Letter, the U.S. Department of Labor (DOL) found that computer technical support employees were not eligible for the administrative exemption. Exh. B, *DOL Op. Ltr.*, 2006 WL 3406603, at pp. 3-4. The DOL considered the case of computer technical support employees who performed the duties described in Section A.2. of this brief. Exh. B, pp.1-2. Specifically, the DOL found that employees whose duties included "installing, configuring, testing, and troubleshooting computer applications, networks, and hardware" were not covered by the administrative exemption to the FLSA. Exh. B, p.4. The DOL explained: "Maintaining a computer system and testing by various systematic routines to see that a particular piece of computer equipment or computer application is working properly according to the specifications designed by others are examples of work that lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption." Exh. B, p.4.

2. <u>The Administrative Exemption Requires a Primary Duty that Involves the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance.</u>

An employee is exempt from overtime under the administrative exemption if the employee is compensated on a salary or fee basis and the employee's primary duty is the performance of office or non-manual work that:

   (a)   "is directly related to the management or general business operations of the employer or the employer's customers" and

   (b)   "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. 541.200(a).

The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. 29 C.F.R. 202(b). Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:

   (1)   whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

   (2)   whether the employee carries out major assignments in conducting the operations of the business;

   (3)   whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

   (4)   whether the employee has authority to commit the employer in matters that have significant financial impact;

   (5)   whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

   (6)   whether the employee has authority to negotiate and bind the company on significant matters;

   (7)   whether the employee provides consultation or expert advice to management;

    (8)    whether the employee is involved in planning long- or short-term business objectives;

    (9)    whether the employee investigates and resolves matters of significance on behalf of management; and

    (10)    whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. 29 C.F.R. 541.202(b).

The above factors suggest that the type of "discretion and independent judgment" contemplated is that which allows the employee to exert an influence over management's decisions on policies, objectives, investigations, and commitments with others. This influence is reflected in at least eight of the ten factors above. Therefore, it is not enough if an employee is required to make some decisions regarding how to make a computer perform as required by management. Even if the Plaintiff had solved the computer's problems without supervision or guidance, these activities do not exert an influence over management's policies, objectives, investigations, and commitments with others, and therefore do not constitute the type of discretion contemplated in the regulations. *Id*.

The administrative exemption requires the employee to exercise discretion *with respect to matters of significance*. 29 C.F.R. 541.200(a). "The exercise of discretion and independent judgment must be more than the use of skill in applying well established techniques, procedures, or specific standards described in manuals or other sources." 29 C.F.R. 541.202(e); Exh. B, *DOL Op. Ltr.*, 2006 WL 3406603, at p.3. In rejecting the administrative exemption for computer technical support employees, the DOL has explained the limits of the administrative exemption:

> "The fact that work may be unusually complex or highly specialized along technical lines, or that significant consequences or losses may result from improper performance of the employee's duties, do [sic] not automatically qualify the work as being significant to the management or general business operations of an employer. . . . Thus, although the upkeep of a computer system may be viewed as essential to an employer's business operations,

**16**

>the nature of the individual employee's work, and not the possible results or consequences of its performance, is the focus of the analysis for determining an employee's exempt status." Exh. B, at p.3.

Thus, "an employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly. 29 C.F.R. 541.202(f).

> 3. <u>The Administrative Exemption Does Not Apply to Michael Chicca Because His Primary Duties Did Not Involve the Discretion Required for the Administrative Exemption.</u>

Mr. Chicca's primary duties were updating and correcting the computer user profiles, security levels, and passwords used by Defendant's employees to access Defendant's computer programs. Exh. C, *Chicca Decl.*, ¶17; Exh D, *Morton Depo.*, pp.83-84; Exh. F, *Williams Depo.*, pp.59-60. Mr. Chicca also attended the change management meetings, where he created written minutes and circulated them by e-mail to the various department managers. Exh. C, *Chicca Decl.*, ¶17; Exh. D, *Morton Depo.*, pp. 69-71. Since Mr. Chicca did not have authority to decide what level of security access an employee should have, and merely entered the security information according to department managers' directions, Mr. Chicca's duties amounted to data entry and the services of scribe. Exh. C, *Chicca Decl.*, ¶17; Exh. E, *Brown Depo.*, pp.16-17; Exh. D, *Morton Depo.*, pp.7, 8-9, & 18-19. These duties satisfy none of the factors used in deciding whether there is discretion and independent judgment with respect to matters of significance in 29 C.F.R. 541.202(b).

SLEH periodically reviewed the level of computer access given to each of its employees in two different ways. Exh. C, *Chicca Decl.* ¶18. In the department level review, Mr. Chicca printed out a list of the user profiles, security groups, and passwords, for each program that he supported, and showed this list to a member of the department that supported the program in

question. *Id*. The "client" department (that is, the department that used the program being reviewed), would either approve the level of access granted to each of its employees, or else recommend changes which Mr. Chicca would make. *Id.* In the Internal Audit review, Mr. Chicca went through roughly the same process, except that instead of having the security access reviewed by the service department, Mr. Chicca took the list to the Internal Audit department (IA). *Id*. IA would either approve the level of computer access given to the employees, or demand changes. *Id*. In general, if the department level review was handled correctly, all problems would be resolved before IA's review. *Id*.

Thus, when Mr. Chicca's job description and performance reviews refer to Mr. Chicca participating in compliance reviews and audits, this simply refers to the review process described above. Exh. C, *Chicca Decl*., ¶19. Since Mr. Chicca did not have discretion to decide what level of computer access any employee should have, Mr. Chicca was not in a position to decide what "compliance" with SLEH's rules meant. *Id*; Exh. E, *Brown Depo*., pp.16-17. Mr. Chicca thus did not "implement" policy so much as simply follow his instructions. Exh. C, *Chicca Decl*., ¶19. See also Exh. D, *Morton Depo*., pp. 44-47 & 49 (Chicca's supervisor's description of his duties is substantially the same as Chicca's own description).

Thus, Mr. Chicca did not "formulate, affect, interpret, or implement management policies or operating practices" within the meaning of 29 C.F.R. 541.202(b). Exh. C, *Chicca Decl*., ¶20. Mr. Chicca did not "carry out major assignments in conducting the operations" of Defendant's hospital. *Id*. Mr. Chicca did not affect Defendant's business operations to a substantial degree, and did not have authority to commit Defendant in matters having any financial impact. *Id*. Mr. Chicca did not negotiate on behalf of Defendant or bind Defendant in any matters. *Id*. Mr. Chicca did not provide consultation or expert advice to management. *Id*. Mr. Chicca was not

involved in planning long or short-term business objectives; taking notes at meetings and making minutes is not planning, and Mr. Chicca did not have authority to give directions to other employees at the change management meetings. *Id*; Exh. D, *Morton Depo*., pp.69-71. Mr. Chicca did not investigate or resolve matters of significance on behalf of Defendant, and did not represent the hospital in handling complaints, arbitrating disputes, or resolving grievances. *Id*. Thus, Defendant cannot show evidence that Mr. Chicca's duties satisfy any of the factors for discretion and independent judgment in 29 C.F.R. 202(b). See Exh. F, *Williams Depo*., p.59 (Chicca's primary duty was protecting the hospital's data on its computers).

"The exercise of discretion and independent judgment necessitates consideration and evaluation of alternative courses of conduct and taking action after the various possibilities have been considered." *Lott v. Howard Wilson Chrysler-Plymouth, Inc*., 203 F.3d 326, 331 (5th Cir. 2000). There are not that many different ways to enter security data into a computer program, or that many ways to record the minutes of meetings. Exh. C, *Chicca Decl*., ¶21. The nature of Mr. Chicca's duties did not leave him with an opportunity to choose between multiple courses of conduct, of any great consequence, and therefore Mr. Chicca cannot satisfy the second part of the test for administrative exemption. *Id*.

## IV. CONCLUSION

It is undisputed that Michael Chicca spent six hours a day on ACES requests, one and a half hours a day on Remedy tickets, and at least one hour a day on change management meetings, with the limited role described above. Exh. C, *Chicca Decl*., ¶¶7, 8, & 11; Exh. D, *Morton Depo*., pp. 78, 73, & 92 (Chicca's supervisor, confirming these estimates). Mr. Chicca has demonstrated that his primary duties were the ones described above. Even if Defendant could identify something else that Mr. Chicca did, Defendant cannot show a primary duty other

than those already described.  For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff summary judgment on Defendant's affirmative defense of exemption from the Fair Labor Standards Act.

    Respectfully submitted,

    TRAN LAW FIRM L.L.P.

    /S/Trang Q. Tran_____
    Trang Q. Tran
    Federal I.D: 20361
    Texas Bar No. 00795787
    Andrew H. Iwata
    Federal I.D: 625974
    Texas Bar No. 24048568
    3050 Post Oak, Suite 1720
    Houston, Texas 77056
    Telephone: (713) 223-8855
    Facsimile: (713) 623-6399
    **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was forwarded on January 16, 2012, in the following manner to:

    /S/Andrew H. Iwata_____
    Andrew H. Iwata

*(Via Southern District Electronic Filing Notification)*
Jennifer Joy Cooper
Nelsy Gomez
A. Martin Wickliff, Jr.
Cozen O'Connor
1000 Louisiana, Suite 5400
Houston, Texas  77002