IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL CHICCA | § | |
| | § | |
| Plaintiff | § | |
| | § | CIVIL ACTION NO. 4:10-cv-02990 |
| v. | § | |
| | § | |
| ST. LUKE'S EPISCOPAL HEALTH | § | |
| SYSTEM | § | |
| Defendant | § | |

**ST. LUKE'S EPISCOPAL HEALTH SYSTEM'S
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

COZEN O'CONNOR

/s/ A. Martin Wickliff, Jr.
A. Martin Wickliff, Jr.
State Bar No. 21419900
Federal Bar No. 3466
Jennifer J. Cooper
State Bar No. 24013541
Federal Bar No. 578926
Nelsy C. Gomez
State Bar No. 24059835
Federal Bar No. 932913
1221 McKinney, Suite 2900
Houston, Texas 77010
Telephone (832) 214-3900
Facsimile (832) 214-3905
**ATTORNEYS FOR DEFENDANT
ST. LUKE'S EPISCOPAL HEALTH SYSTEM**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ...................................................................................................1

II.  **NATURE AND STAGE OF PROCEEDINGS** .............................................2

    A.   Previous Litigation Involving St. Luke's and Chicca ...............................2

    B.   Chicca's Current Suit......................................................................................2

III.  **RELEVANT FACTS**................................................................................................3

    A.   St. Luke's Organizational Structure ...........................................................3

    B.   Relevant Policies And Procedures ...............................................................3

    C.   St. Luke's Information Technology Function ............................................5

    D.   Employment of Michael Chicca .....................................................................7

          1.   Educational and Professional Background .....................................7

          2.   Chicca's Interview and Hire ..............................................................8

          3.   Chicca as Senior Information Protection Analyst...........................9

              (a)   Chicca's General Description of this Overall Role.....................9

              (b)   Chicca's Description of Specific Duties and Responsibilities.....................9

              (c)   Information Protection Representation on Project Teams ...........................10

              (d)   Analysis and Resolution of ACES Requests and Remedy Ticket Procedures...........................................................................13

              (e)   Performance of Audits .........................................................................14

              (f)   Change Management Administrator and Project Team Leader.................15

              (g)   Monthly Application Report Reviews .......................................16

IV.  **STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT** .............16

V.  **LEGAL AUTHORITY**.........................................................................................16

    A.   Summary Judgment Standard ....................................................................16

    B.   Statute of Limitations.....................................................................................17

C.   FLSA Exemptions ............................................................................17

    1.   Primary Duty .......................................................................18

    2.   The Administrative Exemption .............................................19

    3.   The Computer Professional Exemption .................................19

**VI. ARGUMENT** ......................................................................................20

A.  Chicca's FLSA Claim is Subject to a Two (2) Year Statute of Limitations ...............20

B.  Chicca Was Exempt Pursuant to the Administrative Exemption §541.200(a)(1)-(a)(3). ...........................................................................22

    1.   Chicca Was Paid An Amount Greater Than Statutory Minimum Statutory Minimum On a Salary Basis ................................................22

    2.   Chicca's Primary Duty Was The Performance Of Office Or Non-Manual Work Directly Related To The Management Or General Business Operations Of St. Luke's ............................................................23

    3.   Chicca Exercised Discretion And Independent Judgment With Respect To Matters of Significance ..............................................................24

        a.   Factors Relevant To Determination of Employee's Exercise Of Discretion . And Independent Judgment With Respect To Matters of Significance ..... 24

        b.   Chicca's Had Limited Supervision And Oversight ..................................... 25

        c.   Chicca Held A Lead Role In St. Luke's Information Protection Function ........................................................................... 25

        d.   Chicca's Project Work Required The Exercise of Discretion and Independent Judgment With Respect To Matters of Significance ..............26

        e.   Chicca Exercised Discretion And Independent Judgment With Respect To Matters Of Significance In Resolving ACES Requests ..............................27

        f.   As Change Management Administrator, Chicca's Exercise of Discretion And Independent Judgment With Respect To Matters Of Significance .....28

        g.   Chicca's Remaining Duties Required the Exercise of Discretion And Independent Judgment With Respect To Matters Of Significance ............29

B.  Chicca Was an Exempt Computer Professional ...........................................29

    1.   Chicca Was Compensated On A Salary Basis Of Not Less Than $455 Per

Week ............................................................................................... 29

    2.    Chicca's Was Primarily Engaged in Work Contemplated By The Computer Professional Exemption. ..................................................................... 29

        a.    Chicca's Project Work ................................................................. 30

        b.    Audits ............................................................................................ 31

        c.    Processing ACES Requests ...................................................... 32

**VII.   CONCLUSION AND STATEMENT OF PRECISE RELIEF SOUGHT** ................ 32

## TABLE OF AUTHORITY

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................16,17

*Berquist v. Fidelity Information Services, Inc.,*
    399 F. Supp. 2d 1320 (M.D. FL. 2005)............................................25

*Bobadilla v. MDRC,*
    2005 U.S. Dist. LEXIS 18140 (S.D.N.Y. 2005)..................................7

*Bondy v. City of Dallas,*
    77 Fed. Appx. 731 (5th Cir. 2003).................................................24

*Celotex v. Catrett,*
    477 U.S. 317 (1986)....................................................................17

*Clarke v. JPMorgan Chase Bank,*
    2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. 2010)........................17,31,32

*Dalheim v. KDFW-TV,*
    918 F.2d 1220 (5th Cir. 1990)....................................................18,25

*Damassia v. Duane Reade, Inc.,*
    2005 U.S. Dist. LEXIS 9768 (S.D.N.Y. 2005)..................................20

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)....................................................................17

*Heffelfinger v. Electronic Data Systems Corp.,*
    580 F.Supp. 2d 933 (C.D. Cal. 2008)..........................................22,23

*Johnson v. Big Lots Stores, Inc.,*
    561 F.Supp.2d 567 (E.D. La. 2008)...............................................18

*Lopez v. Corporacion Azucarera de P.R.,*
    938 F.2d 1510 (1st Cir. 1991)......................................................17

*Massaro v. New York Times,*
    1988 WL 59637 (S.D.N.Y. 1988)....................................................7

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988)....................................................................20

*Mireles v. Frio Foods, Inc.,*
    899 F.2d 1407 (5th Cir. 1990)......................................................20

*Reich v. Bay, Inc.*,
    23 F.3d 110 (5th Cir. 1994)......................................................................20

*Singer v. City of Waco*,
    324 F.3d 813 (5th Cir. 2003)..................................................................21

*Stokes v. BWXT Pantex, L.L.C.*,
    424 Fed. Appx. 324 (5th Cir. 2011)...................................................17,20

*Thornhill Pub. Co., v. GTE Corp.*,
    594 F.2d 730 (9th Cir. 1979).................................................................17

*Villegas v. Dependable Constr. Svcs, Inc.*,
    14 WH Cases2d 667 (S.D. Tex. 2008)..........................................18,20,21
    2008 U.S. Dist. LEXIS 98801 (S.D. Tex. 2008).

## STATUTES

29 U.S.C. § 207(a)(1). ..........................................................................18

29 U.S.C. § 213(a)(1). ..........................................................................18

29 U.S.C. § 213(a)(17)(B) ....................................................................19

29 U.S.C. § 225(a). ...............................................................................17

## REGULATIONS

29 C.F.R. § 541.200............................................................................19

29 C.F.R. § 541.202....................................................................23,24,27,28

29 C.F.R. § 541.203(c). .......................................................................28

29 C.F.R. § 541.400 (b)(1). ..............................................................19,30

29 C.F.R. § 541.400 (b)(2). .............................................................19,30,31

29 C.F.R. § 541.400 (b)(4)...............................................................19,30,32

29 C.F.R. § 541.402............................................................................20,22

29 C.F.R. § 541.601(a)............................................................................22

29 C.F.R. § 541.700(a). ........................................................................18

**RULES**

Fed. R. Civ. P. 56(c)..................................................................................16

## INDEX OF EXHIBITS

Exhibit "A" – Villarreal v. St. Luke's – Plaintiff's First Amended Collective Action Complaint

Exhibit "B" – Villarreal v. St. Luke's - Chicca's Notice of Filing of Consent

Exhibit "C" – Villarreal v. St. Luke's – Memorandum Opinion and Order

Exhibit "D" – Affidavit of Elizabeth Morton

Exhibit "E" – St. Luke's Departmental Orientation Acknowledgment

Exhibit "F" – St. Luke's Position Description

Exhibit "G" – Deposition of Andrew Brown

Exhibit "H" – Affidavit of Andrew Brown

Exhibit "I" – Classification Form For Wage and Hour Law Exemption

Exhibit "J" – St. Luke's Policy & Procedure – Performance Appraisal

Exhibit "K" – Deposition of Elizabeth Morton

Exhibit "L" – Deposition of Michael Chicca

Exhibit "M" – Chicca's Resume Bates 000001-000002

Exhibit "N" – Chicca's Resume Bates 000122-000123

Exhibit "O" – Chicca's Resume Bates 000124-000125

Exhibit "P" – Chicca's Resume Bates 000126-000127

Exhibit "Q" – 3/2/98 Offer Letter

Exhibit "R" – Chicca Pay Stub Ending 12/30/07

Exhibit "S" – St. Luke's Employee Handbook

Exhibit "T" – Acknowledgment of Responsibility for Employee Handbook

Exhibit "U" – 2/6/08 Employee Conference Record and 6/12/08 Written Statement from Chicca

Exhibit "V" – Deposition of Deborah Williams

Exhibit "W" – Chicca's 2006 Performance Appraisal

Exhibit "X" – Chicca's 2007 Performance Appraisal

Exhibit "Y" – Plaintiff's Responses to Defendant's First Set of Interrogatories

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL CHICCA | § | |
| | § | |
| Plaintiff | § | |
| | § | CIVIL ACTION NO. 4:10-cv-02990 |
| v. | § | |
| | § | |
| ST. LUKE'S EPISCOPAL HEALTH | § | |
| SYSTEM | § | |
| Defendant | § | |

## ST. LUKE'S EPISCOPAL HEALTH SYSTEM'S
## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendant St. Luke's Episcopal Health System (hereinafter "Defendant" or "St. Luke's")

seeks summary judgment on all claims asserted by Michael Chicca (hereinafter "Plaintiff" or

"Chicca"), and in support thereof submits the following motion for summary judgment and

memorandum.

## I.    INTRODUCTION

St. Luke's seeks dismissal of Chicca's claim that he was improperly denied overtime for

hours worked over 40 in a week, and will demonstrate herein that he was properly classified as

exempt pursuant to the Fair Labor Standards Act.  Chicca filed the instant suit against St. Luke's

Episcopal Health System, seeking payment of overtime and alleging he did not perform exempt

work.  Prior to his resignation and during the relevant period, Chicca was employed by St.

Luke's as an exempt salaried professional with the title Senior Information Protection Analyst,

earning around $80,000 per year.  In documents created before he filed to the instant suit, Chicca

provided detailed descriptions of his duties and responsibilities in this role.  St. Luke's will rely

extensively on those admissions by Chicca to demonstrate he was eligible for both the

Administrative and Computer Professional exemptions pursuant to the Fair Labor Standards Act, and therefore was not owed overtime.  St. Luke's will also demonstrate that the applicable statute of limitations is two (2) years.

## II.   NATURE AND STAGE OF PROCEEDINGS

### A.   <u>Previous Litigation Involving St. Luke's and Chicca</u>

Chicca was an opt-in plaintiff in a previous lawsuit against St. Luke's which sought to certify a class of all employees of St. Luke's who worked for its department providing information technology services.  (Exhibit "A" – Villarreal v. St. Luke's - Plaintiff's First Amended Collective Action Complaint)(Exhibit "B" – Villarreal v. St. Luke's - Chicca's Notice of Filing of Consent).  Plaintiffs alleged all other employees in this group (including Chicca) were similarly situated with respect to job requirements and duties, sufficient to support the lenient threshold for conditional certification.  (Exhibit A; Exhibit B).

Judge Nancy Johnson presided over the case.  (Exhibit "C" - Villarreal v. St. Luke's - Memorandum Opinion and Order)  After the conditional certification issues were fully briefed, and following an oral hearing at which testimony was presented, Judge Johnson distinguished the roles and duties of employees in Help Desk and Desktop Support roles, from those in the other groups within St. Luke's Information Technology department (including the group in which Chicca worked.)[1]  (Exhibit C).  Conditional certification was granted only as to the employees in the Help Desk and Desktop Support roles.  (Exhibit C).

### B.   <u>Chicca's Current Suit</u>

Plaintiff filed the instant suit August 19, 2010 alleging St. Luke's unlawfully failed to pay overtime for hours worked over 40 in a week in contravention of the Fair Labor Standards Act;

---

[1] Specifically, Judge Johnson found, "The employees of the TSC were "Jacks-of-all-trades."  The four other groups within IT services were different, however.  While employees in each of these groups might work on issues that the TSC team could not resolve, end-user resolution was not a primary focus for any of these groups.  Rather, each of the four groups had its own area of expertise...Telecommunications & Security Services specialized in security and privacy...These groups were not primarily responsible for diagnosing and addressing "break/fix" issues, as was the TSC." (Exhibit C, p. 31.)

specifically, he claimed he was misclassified as exempt. Plaintiff also made class allegations, but he never sought, or received, class certification. The parties engaged in and completed written and oral discovery, with the discovery period ending November 30, 2011. The dispositive motions deadline is January 16, 2012, and docket call is currently set for April 16, 2012.

### III.   RELEVANT FACTS

#### A.   St. Luke's Organizational Structure

St. Luke's is a hospital system with the primary functions of providing care and medical services to meet the needs of patients at St. Luke's hospital facilities. (Exhibit "D" – Affidavit of Elizabeth Morton, ¶4). St. Luke's is organized into various teams and departments serving and providing specific sub-functions, ranging from those providing direct patient-care to those serving administrative support functions. (Exhibit D: ¶5). St. Luke's employs a large variety of employees in various roles, such as laboratory technicians, nurses, janitorial workers, accountants, and computer analysts. (Exhibit D: ¶4). Amongst the various teams and departments within St. Luke's are the Human Resources division ("HR") and Information Technology ("IT") department. (Exhibit D: ¶5). HR is responsible for, among other things, carrying out the compensation functions of St. Luke's and St. Luke's hospitals for its employees. Exhibit "H" – Affidavit of Andrew Brown, ¶4). IT is divided into teams and sub-groups to appropriately service the varying technology-related needs of St. Luke's and St. Luke's hospitals, physicians, and employees. (Exhibit D: ¶6).

#### B.   Relevant Policies and Procedures

New employees are presented with new hire documentation and orientation materials to educate them on the policies and procedures at St. Luke's, including information regarding compensation and lodging complaints about same. (Exhibit "E" – St. Luke's Departmental Orientation Acknowledgment). Additionally, new employees are provided with a detailed job

description, which is also accessible on St. Luke's intranet, detailing the duties and responsibilities for the different positions. (Exhibit "F" – Job Description for Senior Information Protection Analyst).

HR is charged with ensuring employees are correctly classified as exempt or non-exempt. (Exhibit "G" – Andrew Brown's Deposition, p. 7, ll. 7-22)(Exhibit H: ¶4). The Compensation department within HR is primarily responsible for evaluating job descriptions prepared and updated by managers and determining proper classifications. (Id.). This group evaluates positions for exemptions when the position is created, when the position requirements are updated, and/or when legal changes warrant same. (Exhibit G: p. 27, ll. 6-25; p. 28, ll. 1-10; Exhibit H: ¶5). The Compensation department relies upon information provided by the Department of Labor, among other resources to evaluate the job description prepared and updated (as warranted) by the department manager in order to make its classification determination. (Exhibit G: p. 11, ll. 8-25; p. 12, ll. 1-7; Exhibit H: ¶5). For example, in 2004, the Compensation department of the Human Resources department conducted a review of numerous positions within IT following the change in relevant regulations. (Exhibit H: ¶7). Specifically, the position at issue, the Senior Information Protection Analyst position, was reviewed in 2004, and based upon this review, remained classified as exempt. (Exhibit "I" – Classification Form For Wage and Hour Law Exemption")(Exhibit G: p. 9, ll. 6-14; Exhibit H: ¶7). Following the 2004 review, the duties and responsibilities assigned to this position remained unchanged; therefore, the position as not reviewed against regarding its exemption classification. (Exhibit H: ¶7).

As described above, the Compensation department uses job descriptions to evaluate the classification for a position. (Exhibit H: ¶4). While these descriptions are created, reviewed, and updated by managers, employees also have the opportunity to contribute to job descriptions annually in a performance review in that they can review the standards and object to any function

incorrectly attributed to the position. (Exhibit H: ¶6). The standards in performance reviews for employee positions are derived from the duties and responsibilities detailed in the particular job descriptions in order to ensure that the employee is carrying out what is required of their position. (Id.). (Exhibit "J" – St. Luke's Policy & Procedure – Performance Appraisal, §2.01). The performance reviews themselves are prepared and completed by the department supervisor overseeing the employee's performance, and are reviewed with the employees. (Exhibit J: §7.03). The employee and the supervisor sign the appraisal form upon completion and discussion of the performance review. (Exhibit J: ¶7.05).

C.   **St. Luke's Information Technology Function**

St. Luke's has several departments providing services to different administrative functions within its hospital system and hospital entities, including information technology. (Exhibit D: ¶5). The Information Technology Services department consists of several primary elements which work together to provide the information technology services needed by St. Luke's employees. (Exhibit D: ¶6). The main elements include "servers," "applications," "desktops," "networking" "equipment and devices," and "information protection." (Id.).

"Servers" are the large computers upon which numerous "applications" (also referred to as "programs" or "software"), databases (of information), and shared files are housed. (Exhibit D: ¶7). The servers are connected to "desktop" computers by various types of hardware and software ("networking" devices), which enable the desktop computers to access the applications on the servers. The information and applications housed on servers are protected from viruses and outside and/or unauthorized access by different applications and implements, referred to as intrusion protection or information protection services. (Id.). To address these various elements, the Information Technology Services department is divided into several functional groups, including the Technology Service Center (Helpdesk {Tier I user support} and Desktop Support {Tier II user support}) and Security Services Group (information protection and security).

(Exhibit D: ¶8).

The Technology Service Center generally provides technical support for St. Luke's and St. Luke's hospitals' employees and physicians, referred to as "users" who regularly use St. Luke's information technology. (Exhibit D: ¶9). The Technology Service Center consists of teams who are responsible for diagnosing and addressing "break/fix" issues that are faced by users. (Id.). This group typically addresses issues that are related to the more basic Microsoft products or from broken or defective hardware and provides the first report and tracking of the issues reported by users via remedy tickets. (Id.). When the Technology Service Center is unable to resolve an issue due to complexity, the ticket is then escalated to the appropriate team that can assist the user with finding a resolution. (Id.).

Employees working as Information Protection Analysts (including Senior Information Protection Analysts) in the Security Services group focus on information protection, or, implementing and maintaining safeguards to nearly 30 applications to ensure the hospital's computer system is secure and privacy is maintained. (Exhibit D: ¶10; Exhibit "K" – Elizabeth Morton's Deposition, p. 7, ll. 1-15; Exhibit "L" – Michael Chicca's Deposition, p. 47, ll. 20-22). This group is not responsible for keeping applications "up to speed," but instead, ensures the proper security measures are in effect, and certifies the applications comply with applicable security policies and standards. (Exhibit D: ¶10). The group also insures application and information including patient records and employee information are accessible only by employees who have legitimate reasons for the information. (Id.). Chicca described the role of the Information Protection department as, "account creation, network security and support for users," and described a number of duties performed by employees in this group to accomplish these purposes (Exhibit L: p. 45, ll. 12-18; See additional cites below in "D").

The educational requirement for exempt employees in this group is a four year degree. (Exhibit L: p. 35, ll. 4-14; Exhibit K: p. 12, ll. 20-25; p. 13, ll. 1-2). Information Protection

Analysts are paid up to $98,000 per year, and are classified as salaried exempt.  (Exhibit D: ¶11).

D.      **Employment of Michael Chicca**

In an effort to avoid a fact dispute regarding the duties and responsibilities of Chicca, St. Lukes relies extensively upon Chicca's own statements, including those in resumes prepared by him prior to the instant suit (and whose accuracy he confirmed in his deposition (Exhibit L: p. 22, ll. 13-20)), testimony obtained in Chicca's deposition, and performance reviews to which he lodged no objection[2].  Courts have repeatedly relied upon representations in resumes and performance reviews as accurate reflections of the actual duties and responsibilities of Plaintiffs in FLSA misclassification cases. *Bobadilla v. MDRC*, 2005 U.S. Dist. LEXIS 18140, (S.D.N.Y. August 23, 2005) ("(performance) evaluation forms are recognized as probative of the nature of an employee's duties.") *Id.* at 25 (citing *Massaro v. New York Times*, 1988 U.S. Dist. LEXIS 5257, No. 87 Civ. 0957, 1998 WL 59637, at *4 (S.D.N.Y. June 6, 1988))..

1.      **Educational and Professional Background**

Chicca received his undergraduate education at North Harris County College, culminating in his graduation in 1986 with a degree in Computer Science Programming, for which he graduated with honors.  (Exhibit L: p. 9, ll. 16-25; p. 10, ll. 1-4)(Exhibit "M" – Chicca's Resume Bates 000001-000002)(Exhibit "N" – Chicca's Resume Bates 000122-000123)(Exhibit "O" – Chicca's Resume Bates 000124-000125)(Exhibit "P" – Chicca's Resume Bates 000126-000127).  Prior to his hire at St. Luke's, Chicca worked as a Systems Analyst for the Security Administration, Services and Control department of Exxon Upstream Technical Computing Company for the preceding 7 years, and as a Telecommunications/PC Specialist for the Exxon Production Research Company from 1981 to 1991.  (Exhibit N; Exhibit L: p. 11, ll. 5-15).  During his tenure in those positions, Chicca gained knowledge and experience providing

---

[2] Chicca confirmed in his deposition that his performance reviews were reviewed with him, and were not the subject of objection or disagreement by him.  (Exhibit L: p. 97, ll. 7-21).

worldwide security administration and help desk support, wrote and maintained user programs, maintained databases, and prepared related ad-hoc and monthly reports for management. (Exhibit N).

### 2.    Chicca's Interview and Hire

Chicca interviewed for the position of Information Protection Analyst at St. Luke's and was provided a job description for the role at that time.  (Exhibit F; Exhibit L: p. 35, ll. 17-25; p. 36, ll 14-16).   He was hired in March 1998 into the Senior Information Protection Analyst position in the Information Protection section within the Telecommunications and Security Services group, for an annual salary of $58,000 per year.[3]  (Exhibit "Q" – 3/2/98 Offer Letter). When he was hired, Chicca understood he would not be paid overtime for hours worked over 40, and he was informed early in his employment that he was expected to complete his work for the day before leaving .  (Exhibit L: p. 37, ll. 7-25; p. 38, ll. 1-25; p. 39, ll. 1-5).  By 2007, Chicca was making approximately $81,000 per year[4].   (Exhibit "R" – Chicca Pay Stub Ending 12/30/07).

Upon his hire, Chicca participated in a New Employee Orientation, where he received a copy of the Employee Handbook and a copy of his job description, and he was informed about St. Luke's intranet, where he can locate St. Luke's policies and procedures. (Exhibit "S" – St. Luke's Employee Handbook).  Chicca acknowledged receipt of the Employee Handbook, which educates St. Luke's employees who to notify or contact regarding work-related issues. (Exhibit "T" – Acknowledgment of Responsibility for Employee Handbook).

### 3.    Chicca as Senior Information Protection Analyst

At all times, Chicca was employed as a Senior Information Protection Analyst; during the relevant period his direct supervisor was Elizabeth Morton who reported to Deborah Williams,

---

[3] This rate represents compensation in the amount of $1,208 per week and $30.21 per hour.
[4] This rate represents compensation in the amount of $3,145 per week and $39.23 per hour.

the director of the Department.  (Exhibit: D: ¶12).  Chicca met with Morton in the context of a

team meeting at least once a month for about an hour.  (Exhibit L: p. 44, ll. 1-23).  He also met

with his supervisor about once every six (6) months to discuss his duties and expectations.

(Exhibit L: p. 106, l. 25; p. 107, ll. 1-2).  Aside from these meetings, Chicca had only occasional

follow-up meetings with Morton, consisting of her confirmation that his work was progressing as

expected.  (Exhibit L: p. 107, ll. 6-16).

### (a)  Chicca's General Description of this Overall Role

As a Senior Information Protection Analyst, Chicca was expected to perform a variety of

tasks and had a number of duties and responsibilities associated with the information protection

function.  In resumes prepared by Chicca, he generally described his role as follows:

> "Held lead role in the establishment, implementation and management of an
> effective Information Protection process and procedures that provides for the
> security of information resources using various platforms and associated
> capabilities against accidental or unauthorized access, modification, destruction,
> or disclosure." (Exhibit O).

> Maintain the security of local and remote information resources 24/7 using
> various platforms and associated capabilities against accidental or unauthorized
> access, modification, destruction or disclosure.  Identify and reduce risks to
> information processing environments and associated areas. (Exhibit N).

### (b)  Chicca's Description of Specific Duties and Responsibilities

Chicca provided specific descriptions of his duties and responsibilities during the relevant

period in his resumes and in deposition testimony.   In addition, these same duties and

responsibilities were referenced in annual performance reviews during the relevant period.

These descriptions provided by Chicca in his resumes and within performance reviews reflect

that Chicca performed the following tasks and duties in the above-cited primary role of

"maintain(ing) the security of local and remote information resources....and identify(ing) and

reduc(ing) risks to information processing environments..." (Exhibit N)[5] (Exhibit L: p. 33, ll. 15-

_____

[5] At all times, Chicca was expected to perform as a senior level analyst.  However, his performance declined during

21).   Furthermore, Chicca confirmed that he carried out these duties and responsibilities with minimal supervision as his interactions with his supervisor were limited to very specific instances such as monthly team meetings or the occasional follow-up meeting.   Exhibit L: p. 44, ll. 15-23; p. 106, ll. 25; p. 107, ll. 1-16).

(c)   <strong>Information Protection Representation on Project Teams</strong>

One of Chicca's responsibilities as a Senior Information Protection Analyst was to represent the interests and concerns of the Information Protection group on project groups, wherein he "identified and reduced risks to information processing environments and associated areas" (Exhibit O; Exhibit J: ¶14).   These projects typically involved the installation of a new application into the St. Luke's computer system, or an upgrade of an existing application on the system. (Exhibit L: p. 50, ll. 11-25; p. 51, ll. 1).   Each project was staffed by a group of individuals representing different aspects of St. Luke's information technology function; Chicca was typically the only representative from the Information Protection group on the project. (Exhibit L: p. 52, ll. 1-13).

As a group, each project's team met to discuss the progression of the project and what changes or tasks had to be completed. (Id. at ll. 14-24).   Chicca explained that his role on project teams was to ensure that user accounts were properly created within the application, and that appropriate security roles were assigned to those accounts.   (Exhibit L: p. 51, ll. 16-25).   For example, the Pathways Materials Management (PMM) project involved a complete replacement of the materials management application which was used for procurement by St. Luke's personnel.   (Exhibit L: p. 51, ll. 5-22; p.55, ll. 15-20).   Chicca was responsible for ensuring users whose responsibilities included procuring supplies were accurately entered into the system, and

---

a period when he was experiencing personal issues arising from a divorce and custody issues.  (Exhibit L: p. 91, ll. 19-25 – p. 92, ll. 1-4).  These performance issues were addressed with Chicca in written discipline, in an effort to bring his performance up to expectations.  (Exhibit L: p. 91, ll. 19-24; see also Exhibit "U" – Employee Conference Record and Written Statement from Chicca demonstrating same).

were assigned proper security levels of access.  (Exhibit L: p. 54, ll. 5-9).

Additionally, Chicca also confirmed in his deposition that he was responsible for creating or modifying various different types of documents regarding the project's software.  He admitted he participated in the documentation of the project and its completion, including tracking the receivables and deliverables in procurement department projects.  (Exhibit L: p. 53, ll. 24-25; p. 54, ll. 1-3; p. 55, ll. 15-20).  Chicca also described another of duties on the project team was the creation of documentation of the user accounts and consultation with the user's department to test the software to ensure the appropriate users were being provided the appropriate levels of access to the applications. (Exhibit L: p. 57, ll. 15-25; p. 58, l. 1; p. 60, ll. 19-25).  Chicca was also responsible for creating and/or modifying a manual with St. Luke's internal procedures. (Exhibit L: p. 59, ll. 5-8; 23-25; p. 60, ll. 1-10; p. 63, ll. 20-25; p. 64, ll. 1-7).  These documents, which were from 20-50 pages in length, reflected the procedures to be used by the IP group with respect to the particular application.  (Exhibit L: p. 63, ll. 2-25; p. 64, ll. 1-7; p. 90, ll. 13-21). Chicca also trained others in the IP team with respect to the aforementioned internal procedures he created or modified with respect to each project.  (Exhibit L: p. 90, l. 25; p. 91, ll. 1-11).

Another task performed by Chicca in connection with each project was consulting with the users to test the software being implemented or changed in the project.  (Exhibit L: p. 60, ll. 19-25).  As Chicca described this task with respect to a procurement-related software, he would "sit down with the representative from the procurement department and go through all of the roles within the application to make sure they function properly."  (Exhibit L: p. 60, ll. 19-25). Similarly, with regard to another project, he described his role in testing the new application as follows:  "I worked with the representative from the nursing administration and went over the access to make sure they were accurate based on need."  (Exhibit L: p. 64, ll. 14-19).  He confirmed this process typically took about a month to complete.  (Exhibit L: p. 61, ll. 1-6).

In order to successfully fulfill his role on a project, Chicca was frequently responsible for

- 11 -

learning and understanding the application, as the vendor providing the product did not usually provide the analysts working on the application project with training on the workings of the applications. (Exhibit "V" – Deborah Williams' Deposition, p. 60, ll. 3-19).  While working with a particular application, Chicca was responsible for identifying any deficiencies or deviations from these standards and best practices in the application. (Exhibit V: p. 59, ll. 16-25; p. 60, ll. 1-19).  If an aspect of the application was deficient and failed to comply with St. Luke's policies or procedures, or industry best practices, Chicca had the ability and authority to deviate from established policies if necessary. (Exhibit K: p. 162, ll. 16-25; p. 163, ll. 12-25; p. 166, ll. 17-25; p. 167, ll. 1-4).  He needed only notify his supervisor about the need for the deviation, make his recommendation, and together they reached a decision regarding the implementation of the deviation. (Exhibit K: p. 164, ll. 18-25; p. 165, ll. 1-25; p. 166, ll. 17-25; p. 167, ll. 1-4).

Chicca's performance reviews further describe his role and work on projects, confirming he "developed project documentation, conducted team training, and the application security design for projects and upgrades, such as: PeopleSoft AP/GL upgrade; ReportXpress upgrade; PMM (MAPS) Requisition Approval Process; OneStaff (Resource Scheduling) upgrade; PHS; Remedy upgrade; and the SIS upgrade." (Exhibit "W" – Chicca's 2006 Performance Appraisal, Bates No. 153).  In addition, in his deposition, Chicca recounted and described these, and several other projects on which he worked as the sole representative for the Information Protection group, performing the aforementioned tasks associated therewith:

- Pathways Materials Management ("PMM"):  the installation of a hospital procurement application (Exhibit L: pp. 51 – 61);
- OneStaff:  an upgrade project of the nursing scheduling application (Exhibit L: pp. 61-65);
- Meds Manager:  an upgrade project of the pharmacy medication tracking application (Exhibit L: pp. 65-66);
- Report Xpress:  an upgrade project of the timekeeping application (Exhibit L: pp. 67-69);
- Surgical Information Systems:  an upgrade project of the surgery scheduling application (Exhibit L: pp. 88-91);

- Multiple <u>McKessin</u> (vendor) projects (Exhibit L: pp. 108-109);
- <u>Bindview</u>:  report-generating software (Exhibit L: p. 113).

In summary, Chicca performed all the various aforementioned duties and tasks with respect to at least 10 applications during the relevant period.

    **(d)**    **Analysis and Resolution of ACES Requests and Remedy Ticket Procedures**

Chicca was also responsible for responding to Access Control Entitlement System (ACES) requests received from users throughout the hospital system.  ACES requests were the mechanisms by which St. Luke's users sought access of the various applications used by St. Luke's, and those related to administrative applications (such as payroll and budgeting) as well as patient care (including those related to pharmacy or prescription orders, patient records, or physician orders).  (Exhibit D: ¶15).  Considering the implications of improperly granting access, Information Protection Analysts were the primary professionals responsible for granting such access.  (Exhibit D: ¶15).

In processing ACES requests, Chicca and other Information Protection Analysts served the overall purpose referenced in Chicca's resume: "supporting HIPAA compliance", and "maintain(ing) the security of local and remote information resources…against accidental or unauthorized access, modification, destruction or disclosure." (Exhibit D: ¶165; Exhibit L: p. 78, ll. 19-25; p. 79, ll. 1-23).  When an ACES request was received by Chicca, he was required to analyze the nature of the request, including what access was being requested, by whom the request was being made, and the existence of requested approvals on access requested.  (Exhibit K: p. 17, ll. 21-25; p. 18, ll. 1).  He then determined if the access requested complied with St. Luke's security policies and industry best standards.  (Exhibit D: ¶16).  If additional supervisory approval was required to complete the request, Chicca sought same and worked on other portions of the request.  (Exhibit L: p. 83, ll. 5-22; Exhibit K: p. 17, ll. 24-25; p. 18, ll.1-11).

Once Chicca determined that the access requested was appropriate and complied with

- 13 -

policies, he configured the application to provide the requested user access to the application; however, given the complexity of the security components of an application, setting up this user access to an application often involved multiple steps. (Exhibit L: p. 121, ll. 9-19; Exhibit K: p. 20, ll. 10-25; p. 21, ll. 1-4). As each application has its own unique process for developing user access analysts must have a thorough knowledge of all the processes in order to respond to the request. (Exhibit L: p. 20, ll. 10-25; p. 21, ll. 1-4). Given the nature of the information contained in the nearly 30 applications supported by the Information Protection group, including those heavily regulated by federal law (such as confidential patient information – regulated by laws and regulations such as HIPAA), St. Luke's Information Protection group ensured via processing of the ACES requests that only users whose duties and responsibilities warranted access, were awarded access to the various applications. (Exhibit L: p. 78, ll. 23-25; p. 79, ll. 1-23; p. 121, ll. 9-19; Exhibit D: ¶17).

(e)    **Performance of Audits.**

Chicca confirmed in his resume and deposition that he "worked closely with internal and external auditors and senior company management" for "annual and ad hoc controls testing, compliance" in performing audits during the relevant period[6]. (Exhibit N; Exhibit M)  The purpose of which was to ensure the appropriate users had access to the information in the application based on need. (Exhibit L: p. 48, ll. 7-9). Audits were performed on approximately 30 applications the Information Protection group serviced at a frequency of at least six months, with some applications affecting or supporting patient care requiring more frequent audits. (Exhibit L: p. 47, ll. 18-25; p. 48, ll. 1-9). Chicca testified any audit could take between two

---

[6] Chicca's performance review confirmed that he "participates in periodic security reviews and compliance testing, in conjunction with Internal Audit..." (Exhibit "X" – Chicca's 2007 Performance Appraisal; Bates No. 149). Another review during the relevant period reflected he "created reports and followed up on security audits for all IP supported application systems: SIS, PMM (MAPS), MedsManager, OneStaff, PeopleSoft, API Report Xpress, SoftMed, Physician Portal, ADAC, Ascent, MIDAS, PHS, HBOC Star, EPR/ChartMaxx, Novell, Patient Monitoring, Care Manager, GroupWise, Novell, NT, and LotusNotes." (Exhibit "W" – Chicca's 2006 Performance Appraisal, Bates No. 155)

- 14 -

weeks and a month to complete. (Exhibit L: p. 49, ll. 1-13).

      **(f)     Change Management Administrator and Project Team Leader**

      Chicca's resumes reflected that one of his duties was the "daily reporting to upper management of all production systems' status, changes, planned and unplanned outages." (Exhibit N; Exhibit O). This description related to another role he described in his resume, as "Change Management Administrator and the project team leader within Change Management for all production, test platforms, and implementation." (as described in Chicca's resume(s) (Exhibits: M, N, O. P)). The Change Management team consisted of individuals representing different areas of St. Luke's information technology department. (Exhibit L: p. 71, ll. 3-12). This team, led by Chicca, met each morning to discuss any and all changes being made to the information technology environment, such as the implementation of a firewall, upgrades to applications or any change impacting the functionality of an application. (Exhibit K: p. 46, ll. 14-25; p. 47, ll. 1-23). The group covered pending and upcoming projects and addressed any planned or unplanned outages resulting from the projects. (Exhibit L: p. 73, ll. 18-22). As part of his role as Change Management Administrator, Chicca was responsible for planning and facilitating Change Management meetings, as well as ensuring appropriate follow-ups occurred.

      **(g)     Monthly Application Report Reviews**

      Another responsibility Chicca performed (in rotation with the rest of the IP group) involved reviewing monthly reports for the different applications showing user account information. (Exhibit L: p. 76, ll. 19-25; p. 77, ll. 18-25; p. 78, ll. 1-18). In this role, it was Chicca's responsibility to review those monthly reports to ensure the information contained therein (with respect to the users with access to the applications) did not raise "red flags" with respect to the application being reviewed. (Exhibit L: p. 78, ll. 1-18).

      While these tasks described above represent several major duties and responsibilities of Chicca, he also performed a number of other tasks related to and arising from his above-cited

primary role of "maintain(ing) the security of local and remote information resources....and identify(ing) and reduc(ing) risks to information processing environments..." as described in the attached resumes and performance reviews.

## IV.   STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

- Can Plaintiff demonstrate that St. Luke's willfully violated the Fair Labor Standards Act? 29 U.S.C. § 225(a).
- Can Plaintiff show St. Luke's willfully violated the Fair Labor Standards Act in classifying Chicca as exempt from the Act's overtime requirements?  29 U.S.C. § 225(a)
- Was Chicca eligible for the administrative exemption pursuant to 29 C.F.R. § 541.200?
- Was Chicca eligible for the computer professional employee exemption pursuant to 29 U.S.C. § 213(a)(17)(B)?

## V.   LEGAL AUTHORITY

### A.   <u>Summary Judgment Standard</u>

Pursuant to *Fed. R. Civ. P. 56(c)*, a motion for summary judgment must be granted when there exists no genuine issue of material fact and the undisputed facts warrant a judgment in favor of the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In deciding a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party seeking summary judgment bears the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  After such a showing has been made, the nonmoving party must set forth, by affidavit or as otherwise provided in *Rule 56*, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. 242, 250.  The party opposing summary judgment is not permitted to rely on "conclusory allegations or unsubstantiated speculation," as such a showing would be insufficient to defeat summary judgment. *See Thornhill Pub. Co., v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.

1979).

B.      **Statute of Limitations**

The statute of limitations for an FLSA overtime claim is two years.  However, when that claim arises out of a "willful" violation, the limitations period is extended to three years.  29 U.S.C. § 225(a).  *Clarke v. JPMorgan Chase Bank*, No. 3:04-cv-1240-J-99MCR, 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. 2010).  An FLSA plaintiff bears the burden of proving that an FLSA violation was willful.  *Stokes v. BWXT Pantex, L.L.C.*, 424 Fed. Appx. 324, 326 (5th Cir. 2011).  Thus a finding that the defendant failed to show good faith does not mean that the plaintiff showed that the defendant willfully violated the statute.  *Stokes*, 424 Fed. Appx. 324, 326 (1999).  An FLSA plaintiff attempting to invoke the three year statute of limitations period cannot survive summary judgment unless he shows that there is a trial worthy issue as to whether the employer knew or showed reckless disregard as to whether its actions were proscribed by statute.  *See Lopez v. Corporacion Azucarera de P.R.*, 938 F.2d 1510, 1515-16 (1st Cir. 1991).

C.      **FLSA Exemptions**

The FLSA generally requires employers pay time and a half for each hour that an employee works in excess of 40 hours.  29 U.S.C. § 207(a)(1).  However, this general rule is subject to several exemptions.  Employers do not have to pay time and a half to employees employed in a "*bona fide* executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  These "white-collar" exemptions serve as affirmative defenses to overtime claims; therefore, the employer has the burden of proving that a plaintiff is properly classified as an exempt employee.  *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 572 (E.D. La. 2008).  The FLSA does not delineate what it means for an individual to fall into the "white collar" exemption.  *Id.*  Instead the FLSA delegates to the Secretary of Labor the task of promulgating regulations to define the exemptions.  *Id.*

### 1.    Primary Duty

A primary consideration in determining if an employee is exempt is whether the "primary duty" of the employee is the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. *See* 29 C.F.R. § 541.700(a). "The essence of the test is to determine the employee's chief or principal duty…The employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Villegas v. Dependable Constr. Svcs, Inc.,* 14 WH Cases2d 667, 673 (S.D. TX, 2008); *citing Dalheim v. KDFW-TV,* 918 F.2d 1220, 1227 [30 WH Cases 113](5th Cir. 1990).

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Time alone, however, is not the sole test. Employees who do not spend more than 50 percent of their time performing exempt duties may meet the primary duty requirement if the other factors support such a conclusion. *See Dalheim v. KDFW-TV,* 918 F.2d 1220, 1224 (5th Cir.1990).

### 2.    The Administrative Exemption

One "white collar" exemption is the administrative exemption. The applicable test for the administrative exemption is set forth in 29 C.F.R. § 541.200. In order to be considered an exempt administrator, an employee must: (1) be compensated on a salary or fee basis at a rate of not less than $455 per week; (2) have a primary duty of performing office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) exercise of discretion and independent judgment with respect to matters of significance. § 541.200(a)(1)-(a)(3).

### 3.    The Computer Professional Exemption

Another "white collar" exemption is the computer professional exemption. To be considered an exempt computer professional, an employee must be compensated on a salary

- 18 -

basis at a rate of not less that $455 per week, or alternatively compensated at an hourly rate of not less than $27.63 an hour. § 213(a)(17)(B). In addition, the employee's primary duties must include one or more of the following:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

> 29 C.F.R. § 541.400 (b)(1)-(b)(4).

In addition, the Regulations specifically contemplate that computer employees eligible for the computer professional exemption may also qualify as exempt administrative employees.[7]

## VI.  ARGUMENT

**A.    Chicca's FLSA Claim is Subject to a Two (2) Year Statute of Limitations.**

The default limitations period for an FLSA claim is two (2) years. If an FLSA plaintiff meets the burden of proving that an FLSA violation was willful, a three (3) statute of limitations period applies. *Stokes v. BWXT Pantex, L.L.C.*, 424 Fed. Appx. 324, 326 (5th Cir. 2011). Chicca cannot meet his burden of proof that St. Luke's willfully violated the FLSA and, therefore, the appropriate period is two (2) years.

An employer willfully violates the FLSA only when it can be demonstrated the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the

---

[7] Specifically, 29 C.F.R. § 541.402 states, "Computer employees within the scope of this exemption, as well as those employees not within its scope, may also have executive and administrative duties which qualify the employees for exemption under subpart B or subpart C of this part. For example, systems analysts and computer programmers generally meet the duties requirements for the administrative exemption if their primary duty includes work such as planning, scheduling, and coordinating activities required to develop systems to solve complex business, scientific or engineering problems of the employer or the employer's customers."

statute." *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).    Reckless disregard involves the employer's actual knowledge of a legal requirement, and a deliberate disregard of the risk that the employer is in violation. *Damassia v. Duane Reade, Inc.* 2005 U.S. Dist. LEXIS 9768, *7 (S.D.N.Y. 2005).    A violation is willful if an employer continued a practice without further investigation after it was informed by the Wage and Hour office that its payment method violated FLSA.    *Villegas v. Dependable Constr. Svcs, Inc.*, 14 WH Cases2d 667, 689 (S.D. TX, 2008); citing *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994).    An employer is not acting willfully even if he fails to seek legal advice on his payment method or acted unreasonably in violating FLSA.    *Villegas v. Dependable Constr. Svcs, Inc.*, 14 WH Cases2d 667, 689 (S.D. TX, 2008); citing *Mireles v. Frio Foods, Inc.* 899 F.2d 1407 (5th Cir. 1990).    Evidence of willfulness includes admissions from management that they knew they were violating FLSA prior to the lawsuit.    *Villegas v. Dependable Constr. Svcs, Inc.*, 14 WH Cases2d 667, 689 (S.D. TX, 2008), citing *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821-22 (5th Cir. 2003).

St. Luke's was not, in any way, willfully noncompliant with the FLSA; to the contrary, St. Luke's made great efforts to ensure the positions were accurately classified. As a practice, the Compensation department within St. Luke's Human Resources function evaluated the exemption classification of positions when a new position is created or modified by the position's supervisor, and/or when legal changes impacting same are enacted. With respect to the classification and review of Chicca's position of Senior Information Protection Analyst, it was officially reviewed by the Compensation department in 2004 following the implementation of new regulations governing exemptions. Following that period, the substantive duties and responsibilities for the position in question did not change, and thus the position was not reviewed for exemption. Nonetheless, employees (including Chicca) had the opportunity to raise issues or concerns to St. Luke's regarding their classifications and/or the duties and

responsibilities as described by St. Luke's. Employee performance reviews were conducted annually, and the standards included in the performance reviews were derived from the duties and responsibilities included in the job descriptions. However, Chicca admitted he never challenged either the standards in the performance reviews or the other statements contained therein. Moreover, Chicca confirmed in written discovery that he never notified anyone at St. Luke's that he believed his failure to be paid overtime was violative of the FLSA. (Exhibit "Y" - Plaintiff's Responses to Defendant's First Set of Interrogatories).

Chicca asserts that St. Luke's willfully violated the overtime provisions of the FLSA therefore subjecting his claims to a three (3) year statute of limitations. However, Chicca cannot support any allegation that St. Luke's demonstrated a reckless disregard for whether its conduct in classifying Chicca as exempt was in violation of the statute. There is simply no evidence that St. Luke's suspected, much less knew, Chicca's classification was in violation of the FLSA prior to the lawsuit, and St. Luke's continues to specifically refute this assertion. Chicca cannot produce credible evidence to the contrary, and therefore his claims are limited to a two (2) year limitations period.

## B.   Chicca Was Exempt Pursuant to the Administrative Exemption.   § 541.200(a)(1)-(a)(3).

Over the course of his employment, and particularly during the relevant period, Chicca was correctly classified as an exempt employee, as he met all the requirements for the Administrative Exemption. Computer professionals such as Chicca have also been found to be exempt under the Administrative Exemption, and they are expressly contemplated as eligible for both exemptions in the Regulations. 29 C.F.R. § 541.402; *Heffelfinger v. Electronic Data Systems Corp.*, 580 F.Supp. 2d 933 (C.D. Cal. 2008)(Court found information technology employees performed advanced work directly related to management policies and business operations sufficient to support the application of the administrative exemption, when they

- 21 -

worked to ensure client network hardware was structured and configured to run various computer systems and applications used by clients and exercised discretion.)

**1.    Chicca Was Paid An Amount Greater Than Statutory Minimum On a Salary Basis.**

Chicca has neither alleged, nor can he support, that he was not paid on a salary basis, or that he was paid less than the statutory minimum. The regulations governing the salary basis test establish that an employee is considered to be paid "on a salary basis" within the meaning of the regulations "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. §541.601(a). Chicca was paid a predetermined amount of compensation which was subject to deduction only under circumstances allowed by the relevant regulations. Given that Chicca has failed to plead or engage in discovery with respect to such an allegation, or present any evidence to prove that St. Luke's failed to pay Chicca in this fashion, St. Luke's has met the first prong of the computer professional exemption inquiry.

**2.    Chicca's Primary Duty Was The Performance Of Office Or Non-Manual Work Directly Related To The Management Or General Business Operations Of St. Luke's.**

Chicca cannot refute that his primary duty was precisely that which was contemplated by the second requirement of the Administrative exemption: office or non-manual work directly related to the management or general business operations of St. Luke's. The relevant regulation, 29 C.F.R. § 541.202, establishes that, to meet this requirement, an employee must perform work that directly relates to assisting with the running or servicing of the business, which is distinguishable from an individual working on a manufacturing production line or selling a product in a retail or service establishment. *Id.* In fact, the statute specifically contemplates information technology-based roles as qualifying areas of work: "...computer network, internet

and database administration; legal and regulatory compliance; and similar activities." *Id; see also Heffelfinger v. Electronic Data Systems Corp.*, 580 F.Supp. 2d 933 (C.D. Cal. 2008).

St. Luke's is a hospital system of hospital entities that provide health care services to patients. Chicca's own description of his overall responsibility confirms his primary work was directly related to the management or general business operations of St. Luke's, as he stated his role was to: "Maintain the security of local and remote information resources 24/7 using various platforms and associated capabilities against accidental or unauthorized access, modification, destruction or disclosure. Identify and reduce risks to information processing environments and associated areas." (Exhibit I). Chicca cannot now dispute this element has been met.

> ### 3. Chicca Exercised Discretion And Independent Judgment With Respect To Matters Of Significance.

Similarly, Chicca cannot refute the facts (consisting almost entirely of his own words and/or statements he did not dispute) supporting that he exercised discretion and independent judgment with respect to matters of significance.

> #### a. Factors Relevant to Determination of Employee's Exercise of Discretion and Independent Judgment With Respect To Matters of Significance.

Section 541.202 provides a non-exhaustive list of factors to consider when determining whether the an employee exercises discretion and independent judgment with respect to matters of significance:

- whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
- whether the employee carries out major assignments in conducting the operations of the business;
- whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
- whether the employee has authority to commit the employer in matters that have significant financial impact;
- whether the employee has authority to waive or deviate from established policies and procedures without prior approval;
- whether the employee has authority to negotiate and bind the company on significant

matters; whether the employee provides consultation or expert advice to management;
- whether the employee is involved in planning long- or short-term business objectives;
- whether the employee investigates and resolves matters of significance on behalf of management; and
- whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202.

Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required. See, e.g., *Bondy v. City of Dallas*, 77 Fed. Appx. 731 (5th Cir. 2003) (making recommendations to management on policies and procedures.)

### b. Chicca Had Limited Supervision And Oversight

As a threshold matter, Chicca carried out all his duties and responsibilities with limited supervision. Courts consider the non-routine nature of an employee's duties along with that employee's ability to exercise independent discretion. This independence was found by one court to be sufficient to support that an exemption existed, as it granted an employer's summary judgment motion on that basis when the plaintiff's primary job duties involved, "...continuing the work from the previous day..." which consisted of "...either continuing on a design, continuing with programming, [or] finding out other things that needed to be done on a project." *Berquist v. Fidelity Information Services, Inc.,* 399 F. Supp. 2d 1320, 1331 (M.D. FL. 2005).

Chicca confirmed in his deposition that his interactions with his supervisor were limited to weekly team meetings, in meetings every six months, and in occasional follow-up meetings wherein his supervisor checked in to ensure everything was going as it should. Moreover, Chicca admitted that with respect to his work conducting audits (wherein he ensured only current employees with legitimate reasons to access the application had access to same), he received instruction to conduct the audit, and he "just took it from there" without further instruction. (Exhibit L: p. 49, ll. 14-25 – p. 50, ll. 1-2). Chicca clearly worked independently, with little

- 24 -

oversight, and utilized his discretion to accomplish his tasks and duties.

       **c.**     **Chicca Held A Lead Role In St. Luke's Information Protection Function.**

     The essence of the test in exemption cases is the determination of the employee's chief or principal duty. "The employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 [30 WH Cases 113](5th Cir. 1990).

     Chicca described his function as the "lead role in the establishment, implementation and management of an effective Information Protection process and procedures that provides for the security of information resources using various platforms and associated capabilities against accidental or unauthorized access, modification, destruction, or disclosure." (Exhibit O). The overall "lead" role and function of Chicca as he described it required the exercise of discretion and independent judgment with respect to matters of significance.

       **d.**     **Chicca's Project Work Required The Exercise of Discretion and Independent Judgment With Respect To Matters of Significance**

     Chicca admitted that, with respect to most of the numerous projects during the relevant period, he was the sole representative from the Information Protection group for each project on which he worked. His overarching responsibility, including that related to projects, was to "identify and reduce risks to information processing environments and associated area" (Exhibit N). Chicca was usually the only project team member charged with completing project related tasks, including: evaluating and confirming compliance of new applications or upgrades with St. Luke's requirements pertaining to information security; tasks associated with ensuring user accounts were properly created within the application; ensuring proper security roles were assigned to newly created user accounts; documenting and tracking the receivables and deliverables of a project; and creating and/or modifying internal policies and procedures related

to the applications to ensure the procedures reflected the changes resulting from the project itself. When the new or upgraded application required a deviation from St. Luke's or established information protection best practices, Chicca was expected, and did, provide recommendations for addressing and implementing deviations from these policies or otherwise resolving the issue. His supervisor confirmed that Chicca did, indeed offer such recommendations, which he discussed with her prior to implementation.

Chicca's project work confirms that he exercised the discretion and independent judgment with respect to matters of significance. He was usually the sole representative ensuring the information protection aspect of the projects were addressed. His participation on these projects constituted "major assignments in conducting the operations of business" which "affects business operations to a substantial degree." 29 C.F.R. § 541.202.

Moreover, in performing the various tasks associated with the projects as described above, Chicca demonstrated that he had the authority to formulate, affect, interpret, or implement management policies or operating practices, especially given that he ensured compliance with St. Luke's policies and practices, created or modified documents implementing same, and provided recommendations addressing and implementing deviations from such policies as warranted and necessary.

e.    **Chicca Exercised Discretion and Independent Judgment With Respect To Matters of Significance In Resolving ACES Requests.**

Chicca also worked independently on matters of significance when he evaluated and resolved ACES requests. This task served the vital overall function described by Chicca in his resume: "management of an effective Information Protection process...that provides for the security of information resources using various platforms and associated capabilities against accidental or unauthorized access, modification, destruction or disclosure." (Exhibit O).

This function was vital to ensuring the protection of St. Luke's information, and required

that he perform much more than an administrative or ministerial task. In contrast, Chicca was required to apply his knowledge of the application in question (including the levels of authority and information available therein) to determine if the employee requesting access should be provided such access, and if the access should be at the level sought. This important analysis ensured St. Luke's information was protected from within, and helped to prevent employees without legitimate reasons for accessing confidential or privileged information (including private, HIPAA-protected confidential patient health information) from obtaining access to same.

Through his analysis and processing of the ACES requests, Chicca implemented management policies and operating practices and also performed work that affected business operations to a substantial degree. 29 C.F.R. § 541.202. An error by Chicca in analyzing and providing access to confidential patient information, or procurement-related applications, to the wrong employee could result in the release of confidential and protected information (as protected by laws and regulations such as HIPAA) or the misappropriation of St. Luke's property.

f.    **As Change Management Administrator, Chicca Exercised of Discretion and Independent Judgment With Respect To Matters of Significance**

The applicable regulations confirm that an employee who "…leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements) generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team." 29 C.F.R. §541.203(c).

Chicca repeatedly identified himself as "Change Management Administrator and Team Lead for all production and test platforms and implementations" in his resumes, and explained in his deposition that this team was responsible for oversight of all changes to St. Luke's

- 27 -

information technology. Chicca, alone, was the lead for the group, and he also played a role as a representative of information protection concerns involving projects discussed in the meetings. In this role, he performed work that affected business operations to a substantial degree, as it was his responsibility to lead the team in overseeing major information technology projects and ensuring these projects are carried out appropriately considering all possible implications and impacts.

### g.   Chicca's Remaining Duties Required the Exercise of Discretion and Independent Judgment With Respect To Matters of Significance

Chicca's overall role and responsibility was to ensure the information housed within St. Luke's IT implements was protected from inappropriate internal access. While the above mentioned tasks provide a comprehensive overview of the specific work performed by Chicca, other duties and responsibilities were necessary to ensure the overall goal was achieved. Chicca's resumes and performance reviews reference and reflect a number of other security-related tasks, confirming he exercised discretion and independent with respect to information protection, clearly a matter of significance.

## B.   Chicca Was an Exempt Computer Professional

Chicca's role as Senior Information Protection Analyst was also eligible for the computer professional exemption.

### 1.   Chicca Was Compensated On A Salary Basis Of Not Less Than $455 Per Week.

As aforementioned, Chicca has not asserted, nor can he demonstrate he was not paid on a salary basis. He was compensated at both hourly and weekly rates greater than the statutory requirements. Therefore, this requirement is met.

### 2.   Chicca Was Primarily Engaged in Work Contemplated By The Computer Professional Exemption.

To meet the computer professional exemption, St. Luke's must demonstrate Chicca's

primary duties included one or more of the following:

(1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

(2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

(4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.400 (b)(1)-(b)(4).

Chicca's resumes, performance reviews, and deposition testimony reference numerous duties and responsibilities which meet the computer professional exemption, including his project work, performance of audits, and processing ACES request.

**a.    Chicca's Project Work**

Chicca worked on numerous projects which required that he apply systems analysis techniques and procedures, including consulting with users to determine software[8] functional specifications (particularly with respect to the protection of information).   29 C.F.R. § 541.400 (b)(1).  More specifically, with respect to the various projects on which he worked, Chicca consulted with users to identify their considerations and needs for the applications being upgraded or implemented, so that he could properly evaluate the security of the applications and ensure the application could meet the needs of the users while complying with St. Luke's system requirements.

Chicca's project work also required for him to be involved in the documentation, analysis testing or modification of computer programs, which were based on and related to user or system design specifications, to ensure compliance with St. Luke's information protection

---

[8] The terms "applications" and "software" are used interchangeably herein.

needs. 29 C.F.R. § 541.400 (b)(2). Specifically, he created and/or modified internal St. Luke's policies and procedures to reflect the changes and implications of same which resulted from the projects. He also worked with the users as part of the project to test the software being upgraded or implemented to ensure the changes were successful and did not impact the performance of the software in question. Moreover, it was Chicca's responsibility to utilize his knowledge of the applications in question, coupled with his overall experience and understanding of methods for ensuring the protection of information, to address security deficiencies in applications in question. Chicca's analysis and identification of issues resulted in the identification and implementation of changes to resolve same.

Courts have held employees with similar tasks, duties, and responsibilities as Chicca's project work were exempt via the computer professional exemption. For instance, in *Clark v. J.P. Morgan Chase & Co.,* 2010 U.S. Dist. LEXIS 33264; 159 Lab. Cas. (CCH) P35, 732 (S.D.N.Y. March 26, 2010), the Plaintiff's computer professional exemption was upheld when his duties and responsibilities included: ensuring a major component of the information technology system was sufficient (defendant's server capacity); responding to trouble tickets that had been escalated to him from a lower tier help desk group; working on special projects and drafting troubleshooting guides for the defendant's support team; working on upgrade projects of the defendant's servers; and testing software and products. Chicca's participation and role in projects as the only representative of the Information Protection department is sufficient to support the finding that he was an exempt computer professional.

### b.   Audits

Similarly, Chicca worked with users in completing audits to test the access provided to various employees in different roles and positions and identify any issues relating to same. His knowledge of the applications in question, including the information contained therein and levels of access, enabled him to work with users to confirm only those employees who needed to access

the information within the application were granted same, and at levels appropriate for same. These tasks and responsibilities required that he test the programs based upon and related to user or system design specifications. Therefore, he is exempt pursuant to the computer professional exemption. 29 C.F.R. § 541.400 (b)(2).

     **c.**     **Processing ACES Requests**

Finally, in his processing of ACES requests, Chicca utilized his overall knowledge and experience in the protection of information, coupled with his specific knowledge of the more than 30 applications supported by the Information Protection department. He evaluated the request for access, specifically, the position of the employee seeking access, the application for which access was requested, and the level of access. Chicca confirmed the appropriate supervisory authorities confirmed, or signed-off, on the requests, and required same.

Once the analysis confirmed the access granted was appropriate and complied with St. Luke's security, and industry, best practices, Chicca proceeded with implementing, or granting such access. This was more than a "press and click" process, often with multiple steps, for which Chicca used his in depth knowledge of all the applications. Considering the implications of improperly granting access, only information protection analysts granted such access. Given the number of requests, and applications, and the limited number of professionals granting the access, analysts were required to work quickly and utilize their knowledge of the applications effectively.

Chicca used the skills and knowledge contemplated by the computer professional exemption in processing ACES requests, and was therefore exempt under the computer professional exemption. 29 C.F.R. § 541.400 (b)(4). *See Clark v. JP Morgan Chase*, at *51 (court deemed responding to escalated, complicated "incident" tickets received from desktop support personnel to be exempt duties supporting the application of the computer professional exemption).

- 31 -

## VII.   CONCLUSION AND STATEMENT OF PRECISE RELIEF SOUGHT

Chicca's duties and responsibilities during the relevant period constituted exempt work pursuant to both the Administrative and Computer Professional exemptions of the Fair Labor Standards Act.  Therefore, St. Luke's did not violate that law in failing to pay him overtime for hours worked over 40 in a week.  St. Luke's seeks dismissal of Plaintiff's claims with prejudice and an award of attorney's fees and costs borne by St. Luke's.

Respectfully submitted:

COZEN O'CONNOR

/s/ Jennifer J. Cooper
A. Martin Wickliff, Jr.
State Bar No. 21419900
Federal Bar No. 3466
Jennifer J. Cooper
State Bar No.  24013541
Federal Bar No. 578926
Nelsy C. Gomez
State Bar No. 24059835
Federal Bar No. 932913
1221 McKinney, Suite 2900
Houston, Texas  77010
Telephone (832) 214-3900
Facsimile (832) 214-3905
**ATTORNEYS FOR DEFENDANT
ST. LUKE'S EPISCOPAL HEALTH SYSTEM**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing *St. Luke's Episcopal Health System's Motion for Summary Judgment and Memorandum in Support* was forwarded via facsimile and/or by certified mail, return receipt requested, on this 17th day of January 2012 as follows:

Trang Q. Tran
Andrew H. Iwata
Tran Law Firm, L.L.P.
3050 Post Oak, Suite 1720
Houston, Texas 77056
**VIA FACSIMILE (713)623-6399 AND**
**CERTIFIED MAIL RRR #7003 1680 0004 3403 8078**

/s/ Jennifer J. Cooper
Jennifer Cooper

- 33 -