# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **MICHAEL CHICCA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-10-2990** |
| | § | |
| **ST. LUKE'S EPISCOPAL HEALTH** | § | |
| **SYSTEM,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. No. 32), and Defendant's Motion for Summary Judgment (Doc. No. 35). After considering the motions, all responses thereto, and the applicable law, the Court finds that Plaintiff's motion must be DENIED, and Defendant's motion must be GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

Plaintiff Michael Chicca alleges violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, by St. Luke's Episcopal Health System ("Defendant" or "St. Luke's"). In considering Chicca's FLSA claim, the Court first must consider the nature of Chicca's employment at St. Luke's.

Chicca obtained an undergraduate degree in Computer Science Programming from North Harris County College in 1986. (Chicca Dep. at 9:16-25, Doc. No. 35-L.) In 1998, Chicca interviewed for the position of Information Protection Analyst at St.

1

Luke's. (*Id.* at 35:17-25.) In March 1998, Chicca was hired as Information Protection Analyst in the Information Protection Department of St. Luke's, with a salary of $4834/month. (Offer Letter, Doc. No. 35-Q.) By 2007, Chicca was making $6,801 monthly, or approximately $81,000 per year. (Chicca Pay Stub, Doc. No. 35-R.) During the last three years of Chicca's employment, Chicca's direct supervisor was Elizabeth Morton. (Morton Aff. ¶ 12, Doc. No. 35-D.) Morton reported to Deborah Williams, the director of the department. (*Id.*)

The parties dispute the nature of Chicca's responsibilities at St. Luke's. However, there are some basic facts about which there is no disagreement. St. Luke's is a hospital system that has a number of employees, and a variety of departments. (Morton Aff. ¶ 4; Chicca Decl. ¶ 4, January 14, 2012, Doc. No. 40-1 ("Chicca Declaration No. 1").) One of the departments within St. Luke's is the Information Technology Department ("IT"), which serves the varying technology-related needs of St. Luke's. (*Id.*) IT is sub-divided into teams; one such team is Security Services group, which provides information protection and security. (*Id.* ¶ 8.) The group is responsible for ensuring that proper security measures are in effect, and certifies that technology applications utilized by St. Luke's comply with security policies and standards. (*Id.* ¶ 10.) The group also ensures that secure data, including patient records and employee information, is accessible only by employees who have a legitimate reason to access the information. (*Id.*)

The Security Services group employs Information Protection ("IP") analysts. IP analysts can make up to $98,000 per year, and are classified as exempt employees under the FLSA. (*Id.* ¶ 11.) According to Chicca's supervisor, he was employed as a Senior IP

Analyst. (*Id.* ¶ 12.)[1] Although the contours of Chicca's role at St. Luke's are contested, the parties generally agree that Chicca worked on projects wherein he had to ensure that a particular software application was in line with St. Luke's security standards. They also agree that Chicca worked on responding to Access Control Entitlement Systems ("ACES") requests, which allow St. Luke's users to seek access to various software applications. The specific nature of these tasks (and others), including the extent to which Chicca completed them with independence and discretion, is in dispute.

Defendant's characterization of Chicca's responsibilities relies primarily upon descriptions of Chicca's work drawn from resumes that Chicca created after his departure from St. Luke's in 2008, as well as Chicca's deposition early in this litigation.[2] Defendant also relies upon descriptions of Chicca's duties contained in performance reviews. Chicca relies primarily upon his own declarations, in which he classifies his primary duties as "limited to entering and updating the user profiles, security classifications, and security access codes" for Defendant's employees. (Chicca Decl. No. 1 ¶¶ 12, 17.) Chicca did not, he explains, "write new programs, design new hardware, or re-arrange the configurations of computers." (*Id.* ¶ 22.) According to Chicca, his role in creating user profiles, security groups, and access codes was essentially one of data entry. (*Id.*)

---

[1] Chicca does not dispute this characterization, but it is contrary to the offer letter he received from St. Luke's, which refers to his position only as "Information Protection Analyst." (Offer Letter.)

[2] Defendant has urged that the Court should not consider two declarations in which Chicca explains the job descriptions included in these resumes. In rejecting Defendant's Motion to Strike these declarations, the Court explained that a job description that a plaintiff writes for his resume does not "preclude him from arguing that his day-to-day activities differ from those described in these documents—such actions merely raise credibility questions for the factfinder." *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 400-01 (6th Cir. 2004). (Doc. No. 46.) Indeed, "resumes may not provide the most accurate picture of an employee's job because resumes are typically designed to enhance the employee['] duties and responsibilities in order to obtain a job." *Id.* at 401 (citing *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 688-89 (6th Cir. 2001). Thus, while the Court will consider Chicca's resumes, it also will consider his later explanations of them.

St. Luke's describes Chicca's responsibilities in different terms. According to St. Luke's, in the role of Senior IP Analyst, Chicca's primary responsibility was to "maintain the security of local and remote information resources." (Chicca Resume, Doc. No. 35-N.) In this role, Chicca also served on "project teams." (Chicca Dep. at 50:11-25.) One such project team worked on replacing a "materials management application," called "PMM." (*Id.* at 51:1-13.) Chicca's role in this project was to enter user accounts and assign the proper security roles to those user accounts. (*Id.* at 51:16-20.) In working on this project, Chicca also created a document reflecting the procedures to be followed by the IP department in utilizing the PMM application. (*Id.* at 58:7-13.) Another task that Chicca performed in connection with projects, including the PMM project, was consulting with users to test the software being implemented or changed in the project. (*See, e.g.*, Chicca Dep. at 60:19-25, 64:14-19.) In addition to Chicca's work on projects like the PMM project, Chicca was also responsible for responding to ACES requests. (Morton Aff. ¶ 15.) However, Chicca indicates that, while he input these requests, he did not decide what level of security access any employee would have. (Chicca Decl. No. 1 ¶ 15.)

Chicca was also involved in the installation of new versions to software, or "upgrades," which were provided by the same vendors who provided the original software. (Chicca Decl. ¶ 9.) Chicca indicates that the extent of his involvement with upgrades was to re-enter or import security access information after the new version of the program was installed. Because the installation of an upgrade required the participation of a number of computer technical support departments, the computer technical support division held daily "change management" meetings to discuss the status

4

of plans to install upgrades. (Chicca Decl. ¶ 11.) Chicca contends that, although he "nominally chaired these meetings," he had "no authority to direct any other department or employee." (*Id.*) Chicca's supervisor similarly acknowledges that Chicca's role during the meetings was to advance the slides on the presentation and take notes of the discussion, and that he did not have the authority to set the agenda for the meetings or to schedule the upgrades. (Morton Dep. at 69-71, Doc. No. 32-D.)

Another responsibility that Chicca describes in his resume and deposition is work with internal and external auditors. In his resume, Chicca indicates that he "worked closely with internal and external auditors and senior company management." (Doc. No. 35-N.) The purpose of these audits, according to Chicca's deposition, was to ensure that users had access to the information in the application that they needed. (Chicca Dep. at 48:7-9.) These audits were performed on 28 to 30 applications that the IP group serviced; each of these applications was audited once every six months, with audits taking between two weeks and one month to complete. (Chicca Dep. at 47:18, 25; 48:1-9; 49:1-13.) Chicca performed this responsibility in rotation with the rest of his team. (Chicca Dep. at 48:10-20.) As described by Chicca, the process required him to print out a list of employees' security access files and submit these records to a representative of the department using the application. (Chicca Decl. ¶ 11, Feb. 6, 2012, Doc. No. 40-2 ("Chicca Decl. No. 2").) He also submitted the records to the Internal Audit department for review. (*Id.*) However, Chicca did not decide what employees' security access levels would be; rather, he "merely facilitated a review" by other St. Luke's departments. (*Id.*)

Chicca has filed a Motion for Partial Summary Judgment, asking the Court to grant summary judgment on Defendant's affirmative defense that Chicca was exempt

5

from the FLSA. Defendant also moves for summary judgment, asking the Court to conclude that Chicca was exempt under the FLSA, and asking the Court to find that the applicable statute of limitations in this case is two years. With the above evidence in mind, the Court considers the parties' cross-motions for summary judgment.

## II.     LEGAL STANDARD

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

Factual controversies should be resolved in favor of the nonmoving party. *Liquid Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id.* at 1076 (citation omitted) (internal quotation marks omitted). Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Services, LLC*, 341 F. App'x 26, 28 (5th Cir. 2009)

6

(citation omitted). A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075.

### III.   ANALYSIS

The Fair Labor Standards Act requires employers to pay time and a half for each hour that an employee works in excess of 40 hours, 29 U.S.C. § 207(a), and creates a cause of action for employees against employers that violate these requirements, 29 U.S.C. § 216(b). However, this general rule is subject to several exceptions. *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001). At issue in this case is Section 13(a) of the FLSA, which exempts employees who hold "bona fide executive, administrative, or professional capacity" from the overtime requirements of Section 207(a). 29 U.S.C. § 213(a)(1).

In order to determine whether an employee is exempt under Section 13(a), courts must "determine the employee's chief or principal duty . . . [which] will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) (internal citations omitted). In determining an employee's principal duty, courts consider "the actual, day-to-day job activities of the employee," and "not the labels the employee or the employer place on those duties." *Kohl v. Woodlands Fire Dept.*, 440 F. Supp. 2d 626, 634 (S.D. Tex. 2006) (citing *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 404 (5th Cir. 2002)). To discern what an employee's actual, day-to-day job activities are, general job descriptions contained in an employee's resume or prepared by the employer may be considered, but are not

determinative, and descriptions contained in depositions and affidavits should be considered as well. *Id.* (citing *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 400-01 (6th Cir. 2004)).

Exemptions to the FLSA's overtime provisions must be "narrowly construed against the employers seeking to assert [them]," *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960), leaving the employer with the burden of establishing its entitlement to the exemption. *Dole v. Mr. W Fireworks, Inc.*, 889 F.2d 543, 546 (5th Cir. 1989) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960)). Ultimately, "the inquiry into exempt status under [Section 13(a) of FLSA] remains intensely fact bound and case specific;" as a result, "[e]ach case must be judged on its own peculiar facts." *Dalheim*, 918 F.2d at 1226-27.

### A. Exemptions

As noted above, Section 13(a)(1) of FLSA exempts individuals in executive, administrative, and professional capacities. 29 U.S.C. § 213(a)(1). Defendant contends that Plaintiff is exempt under both the "professional" and the "administrative" exemptions of Section 13(a)(1).[3] Under the "professional" exemption, Defendant urges

---

[3] Defendant also contends that Plaintiff is an exempt computer employee under Section 13(a)(17) of the FLSA, which exempts "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is . . . the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications." 29 U.S.C. § 213(a)(17)(B). However, it is not entirely clear that 213(a)(17) applies to salaried employees, like Plaintiff. Though some courts have found that Section 213(a)(17) does apply to salaried plaintiffs, *Pellerin v. Xspedius Mgmt. Co. of Shreveport, L.L.C.*, 432 F. Supp. 2d 657, 665 n.9 (W.D. La. 2006), others have held that 213(a)(17) applies only to hourly employees. *See Santiago v. Amdocs, Inc.*, 2011 WL 6372348, at *2-3 (N.D. Cal. Dec. 19, 2011); *see also Berquist v. Fidelity Info. Servs. Inc.*, 399 F. Supp. 2d 1320, 1330 (M.D. Fla. 2005) ("In other words, pursuant to 29 C.F.R. § 541.400(b) (2004), computer employees can be exempt under the professional exemption in 29 U.S.C. § 213(a)(1) if they meet the minimum salary requirements of $455.00 a week, *or* under the computer employee exemption, 29 U.S.C. § 213(a)(17), if they meet the minimum hourly requirement of $27.63.") (emphasis added). Because the regulations apply the same standard to computer employees whether a court evaluates their FLSA claim under 213(a)(1) or 213(a)(17), *see* 29

that Plaintiff is exempt as a computer professional. Because Section 13(a)(1) provides

that its terms "are [to be] defined and delimited from time to time by regulations of the

Secretary [of Labor]," 29 U.S.C. § 213(a)(1), the Court looks to the Code of Federal

Regulations for direction on how to construe the Section 13(a)(1) exemptions.

### 1. Professional Exemption for Computer Employees

The regulations provide detailed guidance on how the professional exemption is

to be applied to computer employees. They define this exemption as follows:

> (b) The section 13(a)(1) exemption applies to any computer employee
> compensated on a salary or fee basis at a rate of not less than $455 per
> week . . . exclusive of board, lodging or other facilities, and the section
> 13(a)(17) exemption applies to any computer employee compensated on
> an hourly basis at a rate not less than $27.63 an hour. In addition, under
> either section 13(a)(1) or section 13(a)(17) of the Act, the exemptions
> apply only to computer employees whose primary duty consists of:
>
>> (1) The application of systems analysis techniques and procedures,
>> including consulting with users, to determine hardware, software or
>> system functional specifications;
>>
>> (2) The design, development, documentation, analysis, creation,
>> testing or modification of computer systems or programs, including
>> prototypes, based on and related to user or system design
>> specifications;
>>
>> (3) The design, documentation, testing, creation or modification of
>> computer programs related to machine operating systems; or
>>
>> (4) A combination of the aforementioned duties, the performance
>> of which requires the same level of skills.

29 C.F.R. § 541.400(b). The regulations make clear that not all employees who work

with computers are to be exempted under the FLSA. Such a reading of the exemption

would be "an understandable mistake, one that arises from the common perception that

all jobs involving computers are necessarily highly complex and require exceptional

---

C.F.R. § 541.400(b), the Court need not determine, for the purposes of this Memorandum and Order,
whether 213(a)(17) applies to salaried employees.

expertise." *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 580 (6th Cir. 2004). Instead, "the regulations provide that an employee's primary duty must require 'theoretical and practical application of highly-specialized knowledge *in computer systems analysis, programming, and software engineering*' not merely 'highly-specialized knowledge *of computers and software.*'" *Id.* Bearing this in mind, the Court considers whether the nature of Chicca's employment renders him an exempt computer professional under the FLSA and the standard laid out in 29 C.F.R. § 541.400(b).

The first prong of the computer professional exemption requires the employer to prove that the employee was compensated on a salary or fee basis at a rate of not less than $455 per week. 29 C.F.R. § 541.400(a). The parties do not contest that Chicca's employment met this requirement. The second, more complicated prong requires that Chicca's "primary duty" fit within one of four duties defined in the regulations. 29 C.F.R. § 541.400(b). St. Luke's argues that Chicca is exempt under 29 C.F.R. § 541.400(b)(1) and (b)(2).

### 1. The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications

St. Luke's contends that Chicca applied systems analysis techniques and procedures through his work on projects, his work related to audits, and his work in responding to ACES requests. First, St. Luke's asserts that Chicca worked on numerous projects that required him to apply systems analysis techniques and procedures, including consulting with users to determine hardware, software, or system functional specifications. St. Luke's points to the fact that Chicca consulted with users to identify

their needs for the software applications being implemented so that he could evaluate the security of that software. Though Chicca does not explicitly refer to "projects" in his declarations,[4] he does indicate that his consultations with users were not done for the purpose of determining hardware, software, or system functional specifications. (Chicca Decl. ¶ 13.) Rather, his consultations with users were for the purpose of adjusting employee profiles, including changing security access information. (*Id.* ¶¶ 1-13.) When Chicca sat with employees as they tested programs, his role was to ensure that employees could open certain programs and use the features that should be available to them under their level of security access. (*Id.* ¶ 14.) Chicca's role, as he describes it, was limited to determining whether employees had access to all of the things to which *other* people determined they should have access. Chicca made no such determinations himself.

St. Luke's also emphasizes Chicca's work with users in completing audits to test the security access provided to employees. According to Chicca, however, his role in audits was that of a middleman. In his deposition, Chicca indicates that he only *assisted* in audits (Chicca Dep. at 45:24); he did not generate the information being audited, nor did he determine whether the user accounts being audited were correct. (Chicca Dep. at 46:14-25; 47:1-17.) Chicca's role, as he describes it, was to take information generated by a database administrator, put the information into Microsoft Excel, and present it to an internal audit for review. (*Id.*) That Chicca conducted this role with minimal supervision is of little relevance if Chicca's duties were as circumscribed as he describes them to be. Finally, St. Luke's contends that Chicca's work in processing ACES requests required

---

[4] The term "projects" is so broad that the Court is not entirely sure what it encompasses. Indeed, when Defendant asked Chicca during his deposition whether he worked on "projects," it took clarification from defense counsel for Chicca to understand what was being asked. (Chicca Dep. at 50:11-19.)

him to use his knowledge and experience to evaluate requests for access. This assertion directly contradicts Chicca's declaration testimony that he did not decide what level of security access any employee would have. (Chicca Decl. ¶ 15.) If Chicca is believed, responding to ACES requests was an exercise in data entry, more than anything else. Thus, as to this subsection, genuine issues of material fact remain that preclude the Court from determining Chicca's exempt status as a matter of law.

> **2. The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications**

St. Luke's also urges that Chicca's work on projects required him to be involved in the documentation, analysis, testing, or modification of computer programs. Specifically, St. Luke's contends that Chicca created or modified internal St. Luke's policies and procedures to reflect changes and implications resulting from his work on projects. Chicca offers two responses to this argument, which the Court considers separately: the first is that the computer professional exemption does not apply to Chicca because it applies only "to employees whose primary duties relate to the development of *new or improved* computers, programs, or systems" (Doc. No. 32 at 2) (emphasis added); the second is that this exemption does not apply to Chicca because his responsibilities did not involve the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs.

> **a. Whether the computer professional exemption is limited to employees whose primary duties relate to the development of new or improved computers, programs, or systems**

As noted, Chicca argues that this exemption does not apply to him because he worked only on existing systems, and did not develop new or improved computers, programs, or systems. To support this interpretation of the computer professional exemption, Chicca compares the holdings of two cases unrelated to one another—one from the Sixth Circuit, and one from the Middle District of Florida. Chicca cites *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 579-91 (6th Cir. 2004), as holding that a FLSA plaintiff was not a computer professional because his duties involved installing and troubleshooting existing hardware and software, as opposed to new technology. He contrasts *Martin* with *Bergquist v. Fidelity Info. Servs., Inc.*, 399 F. Supp. 2d 1320, 1331-32 (M.D. Fla. 2005), which he characterizes as holding that a plaintiff who created *new* programs to fit the business plan of a customer was exempt. Plaintiff concludes that these cases create a bright line test under which an employee who implements existing technology is not exempt, whereas one who creates new technology is exempt.

Putting aside the fact that *Martin* and *Bergquist* are not binding on this Court, the cases do not create a bright line test of any sort. First, *Martin* does not, as Plaintiff suggests, distinguish between new and existing technology. Rather, the court clarifies that the plaintiff is not exempt because he "does not do computer programming or software engineering; nor does he perform systems analysis, which involves making actual, analytical decisions about how [the defendant's] computer network should function." *Martin*, 381 F.3d at 580. Thus, *Martin* focuses on whether the employee makes analytical decisions, or whether instead he performs "predetermined specifications in the system design created by others." *Id*. The distinction between old and new simply is not there. *Bergquist* draws no such distinction, either, and emphasizes that the plaintiff was exempt

because he *developed* and *designed* computer programs. 399 F. Supp. 2d at 1331-32. Again, the case focuses on whether the plaintiff's duties fit within the statutory guidelines, not whether the duties relate to new or existing technology.

Plaintiff also urges that the regulations themselves require the Court to draw such a distinction between new and existing technology. Chicca indicates, without support, that "[w]ords like design, development, and creation suggest by their ordinary meanings that they contemplate more than maintaining or restoring existing technology." (Doc. No. 32 at 5.) As to the words "documentation" and "analysis," which obviously do not implicate the implementation of new technology, Plaintiff contends that these "broad words" must be read in the context of the other words to mean that the documentation and analysis contemplated is "that which is a necessary companion of design, development, and creation." (*Id.*) Chicca offers no support for this reading of the regulations, and the Court finds it incorrect. The terms "design, development, documentation, analysis, creation, testing or modification" each must be given equal weight, and no one term in the list can be read as limiting the others. Of course, the terms must be read in the context of each other and of the rest of the clause.[5] Thus, an allegation that Chicca engaged in "documentation" is irrelevant if Chicca did not engage in documentation of computer systems or programs. *Cf. Martin*, 381 F.3d at 581 (finding that the defendant selectively referenced statutory language out of context; the fact that plaintiff consulted with users was unimportant, as there was no evidence that he

---

[5] A basic canon of statutory interpretation, *noscitur a sociis*, counsels that "a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Chicca's reading invokes the principle of *ejusdem generis*, which "limits general terms [that] follow specific ones to matters similar to those specified." *CSX Transp., Inc. v. Al. Dept. of Rev.*, 131 S. Ct. 1101, 1113 (2011) (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936)) (internal quotation marks omitted). As no word in this list is more general (or specific) than any other, the canon of *ejusdem generis* does not apply.

consulted with users "to determine hardware, software, or system functional specifications.").

### b. Whether Chicca's job duties fit within this exemption

Next, Chicca urges that his job duties do not fit within the statutory exemption. However, Chicca does not directly respond to Defendant's argument on this point, which is that Chicca created a document or manual laying out procedures to be used within the information protection department. In his deposition, Chicca admitted that he created or modified such a document. (Chicca Dep. at 58:2-13, 66:7-19.) It is not clear from Chicca's deposition or from any of the evidence submitted what went into the creation or modification of this document, or others like it. Thus, though the evidence supports the fact that Chicca engaged in documentation, it is unclear whether it was documentation "of computer systems or programs" as required by the regulations. There is likewise no evidence that Chicca engaged in the design, development, analysis, creation, testing, or modification *of computer systems or programs*. Thus, as to this prong, a genuine issue of material fact remains.

Because factual issues remain that preclude the Court from granting summary judgment to Plaintiff or Defendant on the computer professional exemption, the Court next considers whether the administrative exemption applies.

### 2. Administrative exemption

The FLSA regulations define the term "employee in a bona fide administrative capacity" as one who is:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. 541.200(a). Again, the parties do not dispute that Chicca was compensated at the applicable salary rate. Defendant argues that Chicca's job responsibilities also met prongs (2) and (3) of the administrative exemption. Chicca urges that they did not.

Before considering prongs (2) and (3) of the administrative exemption, however, the Court must address Chicca's contention that the administrative exemption cannot apply to computer technical support employees at all. Chicca cites a Department of Labor ("DOL") Opinion Letter from 2006, which found that employees whose duties included "installing, configuring, testing, and troubleshooting computer applications, networks, and hardware" were not covered by the administrative exemption. *See* Dept. of Labor Wage & Hr. Op. Ltr., FLSA 2006-42, Oct. 26, 2006. Notably, this letter only states that certain types of computer employees are ineligible for the administrative exemption, not that the exemption is unavailable for all computer professionals. *Id.*

It is well-established that interpretations in opinion letters "do not warrant *Chevron*-style deference," and "are entitled to respect" only to the extent that they are persuasive. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (internal citations omitted) (internal quotation marks omitted). Ultimately, this opinion letter is not persuasive, as it applies only to "IT Support Specialists." Dept. of Labor Wage & Hr. Ltr. The employees addressed in the DOL's opinion letter were, specifically, "responsible for

the diagnoses of computer-related problems as requested by employees, physicians, and contractors of the employer." *Id.* These responsibilities are unrelated to Chicca's responsibilities, which involve system security and access. Thus, the opinion letter relied upon by Chicca is inapplicable to the facts of this case, and the Court must consider whether Chicca's job responsibilities fit within prongs (2) and (3) of the administrative exemption.

>   **1. Primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers**

The regulations indicate that, to meet this requirement, an employee must perform work that directly relates to assisting with the running or servicing of the business, as opposed to work on a manufacturing production line or selling a product in a retail or service establishment. 29 C.F.R. § 541.202. The regulations specifically contemplate some information technology roles as qualifying areas of work, listing "computer network, internet and database administration; legal and regulatory compliance; and similar activities." *Id.*; *see also Heffelfinger v. Elec. Data Sys. Corp.*, 580 F. Supp. 2d 933 (C.D. Cal. 2008). St. Luke's urges that Chicca "cannot now dispute" that this element is met, in light of a statement in one of Chicca's resumes indicating that, while at St. Luke's, he "[m]aintain[ed] the security of local and remote information resources 24/7 using various platforms and associated capabilities against accidental or unauthorized access, modification, destruction or disclosure," and "[i]dentif[ied] and reduce[d] risks to information processing environments and associated areas." (Doc. No. 35 at 32 (citing

17

Chicca's Resume, Doc. No. 35-N).)[6] St. Luke's does not explain how this statement indisputably proves that Chicca's responsibilities satisfy this prong of the analysis.

Chicca argues that his duties were not directly related to the management or general business operations of St. Luke's. He urges that he did not decide what computer system or application St. Luke's would purchase, or how it would be used, and did not set policies for computers that could govern other employees. (Chicca Decl. No. 2 ¶ 17.) In a declaration that qualifies statements made in his resumes, Chicca explains that the phrase "[i]dentify and reduce risks to information processing environments and associated areas" meant that he "printed out a list of employees' security access profiles for each application and submitted them to a representative of the department using the application," as well as to the "Internal Audit department." (Chicca Decl. No. 2 ¶ 11.) Chicca did not, he indicates, decide for himself what the appropriate level of access for employees would be. (*Id.*) In light of this conflicting evidence, the Court cannot determine, as a matter of law, whether Chicca's work was related to the management or general business operations of St. Luke's.

### 2. Primary duty includes the exercise of discretion and independent judgment with respect to matters of significance

Even if no factual questions existed as to the second prong, above, factual issues clearly remain as to whether Chicca's primary duty included the exercise of discretion and independent judgment with respect to matters of significance. The regulations offer guidance on the meaning of this requirement. The requirement "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after

---

[6] Defendant incorrectly cites to its own Exhibit I as the resume containing these statements. The statements are actually in Chicca's resume at Doc. No. 35-N.

18

the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The regulations also provide a non-exhaustive list of factors to consider when determining whether an employee meets this requirement. The factors relevant to this case include:

- whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
- whether the employee carries out major assignments in conducting the operations of the business;
- whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
- whether the employee has authority to commit the employer in matters that have significant financial impact;
- whether the employee has authority to waive or deviate from established policies and procedures without prior approval;
- whether the employee provides consultation or expert advice to management;
- whether the employee is involved in planning long- or short-term business objectives; and
- whether the employee investigates and resolves matters of significance on behalf of management.

29 C.F.R. § 541.202(b). The regulations also make clear that the exercise of discretion and independent judgment requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). The Fifth Circuit has confirmed that "employees who merely follow prescribed procedures or who determine whether specified standards are met, such as inspectors or graders," are not exempted. *Bondy v. City of Dallas*, 77 F. App'x 731, at *2 (5th Cir. 2003) (citing 29 C.F.R. § 541.207(c)).

19

St. Luke's maintains that Chicca had limited supervision and oversight, had a lead role in St. Luke's information protection, and exercised discretion and independent judgment. St. Luke's highlights the fact that Chicca's interactions with his supervisor were limited: in some instances, as with audits, Chicca received instruction to conduct the audit, and he "just took it from there," without further instruction. (Chicca Dep. at 49:14-25 to 50:1-2.) St. Luke's also points to Chicca's work on projects; Chicca's supervisor states that, in conducting this work, Chicca "identified and reduced risks to information processing environments and associated areas," and "was responsible for identifying any deficiencies or deviations" from St. Luke's standards and best practices. (Morton Aff. ¶¶ 13-14.) Defendant also urges that Chicca exercised discretion and independent judgment in resolving ACES requests. Finally, Defendant urges that, as Change Management Administrator, Chicca's responsibilities fit within a provision in the regulations listing examples of employees exempt under the administrative exemption. That regulation provides:

> An employee who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements) generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team.

29 C.F.R. § 541.203(c).

As a general matter, Chicca contends that he had little discretion over his own job duties, and had no discretion at all over the manner in which other employees worked. (Chicca Decl. No. 1 ¶ 21.) There is insufficient evidence to resolve this issue one way or the other. Defendant's emphasis on Chicca's infrequent meetings with his supervisors is

misplaced. Discretion and independent judgment are distinguishable from the ability to resolve relatively minor tasks with limited supervision, which is how Chicca characterizes his work on audits. *Cf. Jackson v. McKesson Health Solutions LLC*, 2004 WL 2453000, at *6 (D. Mass. Oct. 29, 2004) ("By emphasizing that . . . the plaintiff handled many [trouble ticket requests] without supervision, the defendant conflates skill with discretion and independent judgment, thereby failing to heed the statute's warning regarding what is necessary to establish the latter traits."). The evidence regarding Chicca's work on projects is similarly scant. Morton's statement that Chicca identified and reduced risks and deficiencies is broad and vague; it certainly indicates that Chicca exercised some amount of discretion and judgment, but it does not specify how he did so, or that the projects on which he exercised such discretion and judgment were related to matters of significance. The evidence leaves substantial room for doubt. As to whether Chicca exercised discretion and independent judgment in resolving ACES requests, again, the evidence is unclear. Chicca contends that, while he input ACES requests, he did not determine what level of security access any employee would have. (Chicca Decl. No. 1 ¶ 15.) Moreover, it is not self-evident that ACES requests relate to matters of significance.

Finally, the Court considers whether Chicca's responsibilities as Change Management Administrator place him within the ambit of 29 C.F.R. § 541.203(c). In at least one of Chicca's resumes, he identifies himself as "Project Manager/Team Lead and Change Management Administrator for all production and test environments covering multiple applications and platforms including Active Directory and Netware." (Doc. No. 35-M.) Without citing to summary judgment evidence, St. Luke's urges that, in this role:

> Chicca, alone, was the lead for the group, and he also played a role as a representative of information protection concerns involving projects discussed at the meetings. In this role, he performed work that affected business operations to a substantial degree, as it was his responsibility to lead the team in overseeing major information technology projects and ensuring these projects are carried out appropriately considering all possible implications and impacts.

(Doc. No. 35 at 28.) Even if there is evidence to support this characterization of Chicca's role, it is countered by Chicca's own portrayal of his role as Project Manager/Team Lead and Change Management Administrator. As to this role, Chicca's declaration indicates:

> [A]ll this means is that I was responsible for making the minutes at the Change Management meetings and circulating the minutes to the computer support department members and managers afterward. Although [St. Luke's] employees label this as "management" or "administration" it was not the kind of management or administration in which I would have the authority to set the agenda or control the manner in which the upgrades were performed.

(Chicca Decl. No. 2 ¶ 7.) In light of this characterization of Chicca's role as Project Manager/Team Lead and Change Management Administrator, the Court cannot determine whether this duty, if it even was Chicca's primary duty, includes the exercise of discretion and independent judgment.

Ultimately, Defendant's representation of the level of discretion and independent judgment exercised by Chicca conflicts with Chicca's own description of his responsibilities. Because this creates a factual dispute, the issue is improper for summary judgment, and must go to the factfinder.

### B.  Statute of limitations

Finally, St. Luke's moves for a summary judgment determination that the statute of limitations in this case is limited to two years, and that Plaintiff will be able to recover only for acts taking place within that timeframe. Plaintiff responds that the statute is not

so limited, both because St. Luke's acted willfully, and because a continuing violation theory applies to extend the limitations period.

## 1.  Willful Violation

The FLSA provides a two year statute of limitations, except as to claims "arising out of a willful violation," which "may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). An employer willfully violates the FLSA only if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). An employer does not willfully violate the FLSA even if it acts "unreasonably, but not recklessly, in determining its obligation." *Id.* at 135 n.13. The employee bears the burden of proving willfulness. *Stokes v. BWXT Pantex, L.L.C.*, 424 F. App'x 324, 326 (5th Cir. May 4, 2011) (citing *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821) (5th Cir. 2003)).

The only basis for Chicca's claim of willfulness is that Defendant knew about the FLSA, knew of Plaintiff's job responsibilities, and improperly classified him. Such a charge is not enough to show willfulness. Indeed, the Supreme Court has expressly invalidated such a standard of willfulness. In *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 127-28 (1985), the Supreme Court held that the standard formerly used by the Fifth Circuit and a number of other courts, which considered whether an employer knew that the relevant statute was "in the picture," was an improper reading of the willfulness requirement. The Fifth Circuit has recognized that, after *Thurston*, a showing of willfulness under the FLSA requires, at a minimum, reckless disregard. *Halferty v. Pulse Drug. Co., Inc.*, 826 F.2d 2, 3-4 (5th Cir. 1987). Plaintiff has submitted no evidence to

demonstrate such reckless disregard, and therefore ha failed to meet its burden. No reasonable jury could find willfulness on the evidence before the Court.

### 2.   Continuing Violation

Plaintiff also urges that his claims should not be cabined by the two year statute of limitations, and should instead be examined under a "continuing violation" theory. In his initial summary judgment briefing, Plaintiff offered only a cursory reference to the "continuing violation" doctrine, urging that it extends the statute of limitations in this case. The Court therefore requested further briefing on this issue from both parties. (Doc. No. 45.)

The Fifth Circuit has explained that the continuing violation doctrine encompasses two types of cases:

> The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation. The second type of continuing violation is one in which an initial violation, outside the statute of limitations, is repeated later; in this case, each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations.

*Hendrix v. City of Yazoo*, 911 F.2d 1102, 1103 (5th Cir. 1990) (citations omitted). *Hendrix* clarified that FLSA cases invoke the second type of continuing violation. (*Id.*)

Thus, in FLSA cases in which the continuing violation doctrine applies, it allows employees to recover for overtime hours worked dating back to the beginning of the statute of limitations, even if the employee was hired, and the terms of employment were set, outside of the statute of limitations. *Id.* at 1103-04. (citing *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 270-71 (5th Cir. 1987)). As such, even if the continuing violation

doctrine applies in a FLSA case based on misclassification, it does not allow Plaintiff to bring claims for acts occurring outside of the statute of limitations. Rather, it allows plaintiffs whose hire was made outside of the statute of limitations to bring claims for later acts which violated the statute. As a result, "a cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 270, *mod. on other grounds*, 826 F.2d 2 (5th Cir. 1987); *see also Hashop v. Rockell Space Op. Co.*, 867 F. Supp. 1287, 1295 (S.D. Tex. 1994). The continuing violation theory, as applied to this case, would result in a cause of action for misclassification accruing with each new pay period. Any claims with respect to checks received outside of the two year statute of limitations are barred.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's Motion for Summary Judgment must be **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** to the extent it seeks a ruling on the applicable statute of limitations in this case, which the Court has determined is two years. The remainder of the motion is **DENIED**. Plaintiff's Motion for Partial Summary Judgment must be **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this the 12th day of March, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

25